| | |
|---|---|
| RICHARD M. COAN,<br>  *Plaintiff-Trustee*, | |
| v. | No. 3:15-cv-00050 (JAM)<br>Adv. Proc. No. 15-5019 (JAM) (consol.) |
| SEAN DUNNE *et al.*,<br>  *Defendants*. | |

## OMNIBUS RULING ON POST-TRIAL ISSUES

This long-running case is a consolidated action involving claims by a bankruptcy Trustee seeking to recover assets relating to the bankruptcy of Sean Dunne. In May 2019, I presided over a 19-day jury trial on the Trustee's claims. The jury returned a split verdict. It found that Dunne engaged in numerous fraudulent transfers of assets to his former spouse, Gayle Killilea, in violation of the U.S. Bankruptcy Code, Irish law, and Connecticut law, and it awarded the Trustee total damages of €17,765,706 and $278,297.18 against Killilea for those transfers. But the jury also found that the Trustee had not proven various other claims, including fraudulent transfers with respect to certain assets and veil-piercing claims against certain corporate entities.

Following the jury trial, the parties engaged in extended settlement negotiations that have ultimately not succeeded. As a result, this ruling will resolve a number of post-trial issues that have arisen while those settlement negotiations have been taking place over the past two years. For the reasons set forth below, I will deny Sean Dunne's motion for post-verdict relief including a new trial. I will grant in part and deny in part the Trustee's motion for prejudgment interest, and I conclude that the Trustee is entitled to prejudgment interest against Killilea in the total amount of €1,407,229.60. I will deny the Trustee the equitable relief that he seeks on certain issues were reserved for the Court's determination.

I further conclude that, after resolution of these motions, there are no further substantive issues to take up in this long-drawn-out action. Accordingly, final judgment shall enter against Killilea in the total amount of €19,172,935.60 and $278,297.18.

Because the entry of judgment obviates the need for a prejudgment remedy, I will also overrule as moot Killilea and other defendants' objection to Judge Garfinkel's ruling on the Trustee's motion for post-verdict, prejudgment remedies. Additionally, I will grant Killilea and defendant Wahl, LLC's motion to discharge the *lis pendens* on a property located at 22 Stillman Lane in Greenwich, Connecticut subject to their proposed stipulation and representations that the proceeds of any sale of the property will be provided to the Trustee to secure and/or satisfy the judgment in this case. Any motion for reconsideration or to re-open the judgment must be filed within 14 days from the entry of judgment.

BACKGROUND

Sean Dunne was a prominent real estate developer in Ireland with a reported net worth of more than $900 million in 2007. *See Coan v. Dunne*, 2019 WL 302674, at *1 (D. Conn. 2019). But Dunne soon suffered devastating financial reversals after the global financial crisis struck in 2008, and this has set in motion more than a decade of efforts by creditors and bankruptcy trustees in the United States and Ireland to recover from him. *Ibid*.

In 2010 the government of Ireland created the National Asset Management Agency ("NAMA") to acquire troubled bank assets and other obligations. *Ibid*. In the meantime, Dunne and his then-spouse—defendant Gayle Killilea—moved to Greenwich, Connecticut in 2010. *Ibid*. In 2012 Dunne consented to a stipulated judgment against him and in favor of a NAMA-related entity known as National Asset Loan Management, Ltd. ("NALM") for about

$235 million stemming from personal guarantees that Dunne had given to secure debt for his companies. *Ibid.*

NALM, however, suspected that Dunne had concealed assets from his creditors, and so NALM filed an action in 2012 in the Connecticut Superior Court claiming that Dunne had fraudulently transferred various assets to others including Killilea. *Ibid.* Among the defendants named in NALM's action were Dunne, Killilea, and several corporate entities. *Ibid.*

While the state court action was pending, Dunne filed for bankruptcy in March 2013 in the U.S. Bankruptcy Court in the District of Connecticut, and his creditors soon commenced a bankruptcy action against him as well in Ireland. *Id.* at *2. In January 2015, Dunne waived his discharge in the U.S. bankruptcy action, and the bankruptcy Trustee—plaintiff Richard Coan— moved to intervene in the state court action and to remove it to this Court. *Ibid.* The Court granted the Trustee's motion to intervene and denied defendants' motion to remand. *Ibid.*

About two months later, the Trustee commenced a separate but somewhat duplicative adversary proceeding in the Bankruptcy Court against Killilea and others in March 2015. *See Coan v. Killilea*, Adv. Proc. No. 15-05019 (D. Conn.). The Trustee alleged 35 causes of action based on alleged fraudulent transfer of assets or money to Killilea from 2005 to 2008. *See Coan v. Dunne*, 2019 WL 302674, at *2.

In 2018, the removed state court action and the adversary proceeding that had been proceeding on a separate track in the Bankruptcy Court were consolidated before this Court.[1] In April 2019, the Trustee was substituted for NALM as the plaintiff in the state court action as well.[2] In addition to Sean Dunne, several other defendants in the consolidated case are

---

[1] Doc. #52.

[2] Doc. #416.

represented by the same counsel—Killilea, John Dunne, Mountbrook USA, LLC, Wahl, LLC, and TJD21, LLC (together, the "Killilea defendants"). Parallel and related proceedings have also taken place in Ireland, led by the Irish Official Assignee ("OA"), who is the equivalent of the Trustee in the parallel Irish proceedings. *See Coan v. Dunne*, 2019 WL 276203, at *1 (D. Conn. 2019).

Shortly before trial, I limited the claims in this case to only those expressly alleged in the complaints in the removed state court proceeding and the bankruptcy adversary proceeding, and I denied the Trustee leave to file a second amended complaint including additional claims.[3]

The case proceeded to trial in May 2019. The parties presented extensive evidence through 14 trial days. The jury was instructed on 18 counts involving allegedly fraudulent transfers under the U.S. Bankruptcy Code, Irish law, and Connecticut law.[4] For these counts, the jury was instructed that, if it found a fraudulent transfer took place, it should determine which, if any, of the Killilea defendants to hold liable for damages and to provide the amount of damages that each liable defendant should owe.[5] Additionally, the jury was charged with determining whether the Trustee had proven that the corporate veil should be pierced with respect to four corporate entities on either identity or instrumentality theories, and whether the Trustee had proven a fraudulent transfer for which he was entitled to the return of a property located at 22 Stillman Lane in Greenwich, Connecticut.[6] As agreed by the parties, other counts involving equitable claims—including claims for unjust enrichment, an accounting, constructive trust, and

---

[3] Doc. #442 at 29-31 (pretrial conference transcript); *see also Coan v. Dunne*, 2019 WL 1976146, at *1-*2 (D. Conn. 2019) (describing ruling on motion to limit evidence to claims in the complaints).

[4] *See* Doc. #509; Doc. #511.

[5] *Ibid*.

[6] *Id*. at 27-29, 31. The jury verdict sheet inadvertently states 22 Stillman Road, but the relevant property is located at 22 Stillman Lane in Greenwich, Connecticut. *See* Doc. #629-1 at 4.

declaratory judgments—were reserved for my determination based on the evidence submitted at trial.[7]

After five days of deliberations, the jury returned a split verdict. Specifically, the jury found that Sean Dunne engaged in fraudulent transfers under nine of the counts submitted to it:

- In Count 1, the jury found that Dunne engaged in an intentionally fraudulent transfer of an Irish property known as Walford in violation of the U.S. Bankruptcy Code. It found that only Killilea was liable for the transfer and that Killilea was liable for €14,000,000 in damages.[8]

- In Count 2, the jury found that Dunne engaged in a constructively fraudulent transfer of Walford in violation of the U.S. Bankruptcy Code, though it did not hold any of the defendants liable for the transfer.[9]

- In Count 3, the jury found that Dunne engaged in an intentionally fraudulent transfer of an Irish property located at 81 North Wall Quay in violation of the U.S. Bankruptcy Code. It found that only Killilea was liable for the transfer and that Killilea was liable for €100,000 in damages.[10]

- In Count 4, the jury found that Dunne engaged in a constructively fraudulent transfer of the North Wall Quay property in violation of the U.S. Bankruptcy Code. It found that only Killilea was liable for the transfer and that Killilea was liable for €200,000 in damages.[11]

- In Count 10, the jury found that Dunne engaged in three constructively fraudulent transfers between August 2011 and April 2012 of a stream of payments known as the Lucy Partnership payments in violation of the U.S. Bankruptcy Code. It found that only Killilea was liable for the transfers and that Killilea was liable for €258,000 in total damages for the transfers.[12]

- In Count 11, the jury found that Dunne engaged in two intentionally fraudulent transfers of other Lucy Partnership payments between October 2010 and March 2011 in violation of Irish law. It found that only Killilea was liable for the transfers and that Killilea was

---

[7] *See* Doc. #604 at 6 (charge conference transcript).

[8] Doc. #509 at 1.

[9] *Id*. at 1-2.

[10] *Id*. at 2.

[11] *Id*. at 2-3.

[12] *Id*. at 4-5.

liable for €192,706 in total damages for the transfers. The jury also found that three other transfers charged in Count 11 were not intentionally fraudulent under Irish law.[13]

- In Count 21, the jury found that Dunne engaged in an intentionally fraudulent transfer of €3,015,000 from his joint Credit Suisse account with Killilea to her individual account in violation of Irish law. It found that only Killilea was liable for the transfer and that Killilea was liable for damages in the full €3,015,000 amount of the transfer.[14]

- In Count 25, the jury found that Dunne engaged in an intentionally fraudulent transfer of his 50% interest in the IGB Lands to Killilea in violation of Irish law, though it did not hold any of the defendants liable for the transfer.[15]

- In Count 27, the jury found that Dunne engaged in intentionally fraudulent transfers of approximately $278,297.18 to Killilea on various dates between July 2010 and November 2010 in violation of Connecticut law. It found that only Killilea was liable for the transfers and that Killilea was liable for damages in the full $278,297.18 amount of the transfers.[16]

In total, the jury awarded the Trustee total damages of €17,765,706 and $278,297.18 against Killilea.

The jury otherwise found that the Trustee had not proven his claims with respect to the remaining counts, including fraudulent transfer claims related to other Lucy Partnership payments; the transfer of certain rents known as the Ouragh rents as well as certain furniture and fixtures of the Ouragh property; transfer of Dunne's membership interest in Mountbrook USA to Killilea; transfer of Dunne's interest in Swiss Condominiums to Killilea; and transfer of Dunne's interest in Beara Properties Director's loans to Killilea.[17] The jury also found that Dunne had not engaged in a preferential transfer of Ouragh rents to Killilea.[18] And it found that the Trustee had not proven his veil-piercing claims under either identity or instrumentality theories and that the

---

[13] *Id.* at 5-6.

[14] *Id.* at 8.

[15] *Id.* at 9.

[16] *Ibid.*

[17] *Id.* at 3-8.

[18] *Id.* at 9-10.

Trustee was not entitled to the return of the property at 22 Stillman Lane.[19]

Following the jury's verdict, I temporarily stayed briefing on post-trial issues for 45 days and otherwise deferred consideration of post-trial motions to allow the parties to engage in global settlement talks with U.S. Magistrate Judge Robert M. Spector.[20] Because the parties were ultimately unable to reach a settlement, they have asked me to adjudicate post-trial motions. In particular, Sean Dunne has moved for post-verdict relief.[21] The Trustee has moved for prejudgment interest on the jury verdict as well as for entry of judgment on his equitable claims.[22] The Killilea defendants have objected to a ruling by U.S. Magistrate Judge Garfinkel granting the Trustee's motion for post-verdict, prejudgment remedies, and Killilea and Wahl have moved to discharge the *lis pendens* on 22 Stillman Lane.[23] I heard oral argument on these issues on July 7, 2021, and this ruling now follows.

DISCUSSION

I will address each of the pending post-trial issues in turn.

## I.    *Sean Dunne's motion for post-verdict relief*

I will first address the argument that Dunne does not have standing to bring this post-trial motion, and then I will address each of Dunne's arguments for post-verdict relief in turn.

### A.  *Standing*

The Trustee argues that Sean Dunne lacks standing to seek post-verdict relief because "he was not found liable for any claims in the jury verdict" and because he should not be able "to

---

[19] *Id*. at 10.

[20] *See* Doc. #518; Doc. #520 (status conference transcript).

[21] Doc. #570.

[22] Doc. #627; Doc. #524.

[23] Doc. #647; Doc. #629.

seek post-verdict relief on behalf of his co-defendants against whom the jury found liability."[24] At oral argument, the Killilea defendants for the first time also made a conclusory argument that Dunne lacks standing to bring his motion.

The argument is not persuasive. Dunne is a party defendant in this action. The Trustee opposed Dunne's motion to be dismissed as a defendant in this action.[25] Dunne participated in the trial through counsel. Although the jury was not asked whether to assign Dunne liability, it still found that he engaged in fraudulent transfers—a finding that is against his legal interests. As I explained when I denied Dunne's motion to be dropped as a defendant in this action, "[i]t is clear to me that Dunne was properly joined as a defendant in accordance with Rule 20's requirements of common questions of law and fact among the defendants." *Coan v. Dunne*, 2019 WL 1513461, at *2 (D. Conn. 2019). I further explained that, because the Trustee's complaint included an equitable claim against Dunne for an accounting, it was important that Dunne also be bound by any judgment against his co-defendants so that he—as a prime participant in all that allegedly happened—would be required to participate in an accounting, if the Court determined that an accounting was warranted. *See ibid*.

Based on the same reasoning, the jury's verdict binds Dunne and affects his legal rights, including whether he should be liable to render an accounting under the remaining equitable claim against him. Indeed, as discussed below, the Trustee is currently seeking an accounting from Dunne on the basis of the jury's verdict. To the extent that post-verdict relief is warranted, I conclude that Dunne has standing to seek it.[26]

---

[24] Doc. #655 at 1-2 n.1.

[25] Doc. #204.

[26] Relatedly, I also reject the Killilea defendants' untimely request at oral argument that I defer consideration of Dunne's motion until they have filed their own motion for post-trial relief. To the extent that the Killilea defendants believe that they are prejudiced by Dunne's motion because they could have raised stronger arguments than Dunne, they could have filed an objection or other response to Dunne's motion in the nearly two years since it was filed. *See*

## B. Inconsistent verdicts

Dunne first argues that a new trial must be ordered pursuant to Federal Rule of Civil Procedure 49 because the jury's verdict is "irreconcilably inconsistent." In particular, Dunne argues that the jury's verdict with respect to Walford in Counts 1 and 2 is irreconcilably inconsistent; the jury's verdict regarding North Wall Quay in Counts 3 and 4 is irreconcilably inconsistent; and the jury's verdict finding against corporate veil piercing is irreconcilably inconsistent with the jury's verdict in Counts 1 through 4 finding fraud in the transfers involving Walford and North Wall Quay.[27]

Under Rule 49, "[w]hen the answers are inconsistent with each other and one or more is also inconsistent with the general verdict, judgment must not be entered; instead, the court must direct the jury to further consider its answers and verdict, or must order a new trial." Fed. R. Civ. P. 49(b)(4). "To justify setting aside an otherwise valid jury verdict, the special verdict answers must be *ineluctably* inconsistent. In cases where the special verdict answers appear to be inconsistent but there is a view of the case that makes the jury's answers consistent, they must be resolved that way." *Munafo v. Metro. Transp. Auth.*, 381 F.3d 99, 105 (2d Cir. 2004) (emphasis in original). "If the jury's answers cannot be harmonized rationally, the judgment must be vacated and a new trial ordered." *Kosmynka v. Polaris Indus., Inc.*, 462 F.3d 74, 82 (2d Cir. 2006).

---

*Henkel of America, Inc. v. ReliaStar Life Ins. Co. et al.*, 2021 WL 2857503, at *6 (D. Conn. 2021) (explaining the "better-reasoned view … that any party to litigation may oppose another party's motion for relief if the party can make some showing of likely harm if the relief is granted"). Of course, the Killilea defendants also could have raised their purportedly stronger arguments against the jury verdict through their own post-trial motion in the two years since the jury verdict. They have not done so, and I will not further delay consideration of Dunne's motion to allow the Killilea defendants to file untimely briefing.

[27] Doc. #571 at 21-23.

"It is well established that a party waives its objection to any inconsistency in a jury verdict if it fails to object to the verdict prior to the excusing of the jury. The timely objection requirement is not merely a technicality—it serves to give the court and the opposing party the opportunity to correct an error in the conduct of the trial." *Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 46 (2d Cir. 2015).[28] "[I]t is all the more essential in complicated cases for a litigant to timely notify the court of a perceived verdict inconsistency so as to permit an opportunity for correction of the error while the jury remains empanelled, thereby possibly heading off a second lengthy trial such as the one that occurred in this case." *Id*. at 47.

Some courts have recognized that "[w]aiver may be excused if a verdict constitutes 'fundamental error.'" *Am. Tech. Ceramics Corp. v. Presidio Components, Inc.*, 490 F. Supp. 3d 593, 624 (E.D.N.Y. 2020); *see also Anderson Grp.*, 805 F.3d at 49-50 (discussing whether inconsistent verdict constituted fundamental error). "Fundamental error is more egregious than the plain error that can excuse a procedural default in a criminal trial, and is so serious and flagrant that it goes to the very integrity of the trial." *Anderson Grp.*, 805 F.3d at 49.

Dunne did not object to the alleged inconsistencies in the jury verdict at trial before the Court discharged the jury. After the jury returned a verdict on June 4, 2019, I observed the potential issue with the verdict that Dunne now raises related to damages for North Wall Quay.[29] In a sidebar, the Trustee's counsel stated "[t]here seems to be a mistake," and absent objection, I requested that the jury reconsider its verdict only with respect to Counts 3 and 4.[30] I instructed the jury:

---

[28] Unless otherwise indicated, this ruling omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions.

[29] *Id.* at 7-8 (Tr. 2921-22).

[30] *Id.* at 7-9 (Tr. 2921-23).

[J]ust for clarity's sake, in light of the Court's instruction to ensure against any kind of possible double recovery or an inconsistent recovery, there is with respect to the jury's verdict as to Count 3 and Count 4, there is a different amount that the jury has filled in there. … I'm simply going to ask you to actually go back, consider whether there's a basis in your deliberations for that. There may well be, in which case you would adhere to that. But we want to make sure, in the event that there's any kind of a further consideration of the jury's verdict in the case, that it is not the result of any kind of a misapprehension of anything. So what we'll do is just ask you to go back into the jury room. If indeed this is correct, then come on back and we'll be ready and waiting for you. … All we're going to do is ask you to go back, and if indeed it is absolutely correct, that you wish the verdict form just as it is, come on back and we'll enter the verdict as is. If it's not, then we just ask you to reconsider that issue and solely with respect to Counts 3 and 4, okay?[31]

The jury deliberated again, and then stated, "[w]e have reviewed our evidence and will continue with our original decision."[32]

After the verdict was read, I asked all counsel for another sidebar and allowed them to review the verdict form.[33] I specifically noted that "with relation to the intentional fraud count, Count #1, the jury did not answer 'yes' or 'no' as to the other defendants other than Ms. Killilea. My assumption is that the jury meant to say 'no' for the other defendants. If you wish me to make a query, I'll make a query on that."[34] After counsel reviewed the verdict and no counsel objected with regard to the issue flagged on Count 1 or anything else related to the verdict more generally, I excused the jury.[35] At no point during the examination of the verdict did Dunne—as distinct from the Killilea defendants—raise any objection related to the jury verdict being inconsistent.

---

[31] *Id.* at 8-9 (Tr. 2922-23).

[32] *Id.* at 9 (Tr. 2923).

[33] *Id.* at 22 (Tr. 2936).

[34] *Id.* at 22-23 (Tr. 2936-37).

[35] *Id.* at 22-23, 26 (Tr. 2936-37, 2940).

Dunne argues that he nonetheless has not waived arguments related to the inconsistency of the jury verdict because defendants moved for judgment as a matter of law, and because I stated that such motions as well as post-trial briefing were stayed for 45 days after trial pending the parties' settlement discussions.[36] But it was the Killilea defendants who moved for judgment as a matter of law; Sean Dunne did *not* join the motion.[37] Moreover, the Second Circuit has "rejected the argument that a litigant may rely on a motion for judgment as a matter of law to preserve an inconsistency argument." *Anderson Grp.*, 805 F.3d at 47. And while I reserved the parties' rights to file post-trial motions such as this motion for a new trial, that does not preserve Dunne's right to object to the verdict as irreconcilably inconsistent under Rule 49 because Dunne "fail[ed] to object to the verdict prior to the excusing of the jury." *Id.* at 46.

With respect to the Walford property, Dunne also argues that the issue raised in the sidebar "is not the basis of this challenge" and that "Dunne asserts an altogether other issue."[38] This point only underscores that Dunne did not timely raise the challenge.

Dunne further argues that his objections to Counts 3 and 4 related to North Wall Quay are preserved because the "inconsistency was preserved by the jury's own redeliberations."[39] According to Dunne, "[t]here was no need for further objection as the issue was preserved" and he "did not need to lodge a duplicate and unnecessary objection in order to further preserve the issue."[40] But Dunne's briefing cites no caselaw in support of his general preservation theory. To the contrary, the Second Circuit has expressly held that the *party* must object to preserve the

---

[36] Doc. #685 at 6; *see also* Doc. #518; Doc. #520 (status conference transcript).

[37] *See* Doc. #491 at 10.

[38] Doc. #685 at 6, 8.

[39] *Id.* at 12.

[40] *Id.* at 12-13.

issue of whether the verdict is inconsistent. *See Anderson Grp.*, 805 F.3d at 47.

The case that Dunne emphasized at oral argument, *Kosmynka v. Polaris Indus., Inc.*, 462 F.3d 74 (2d Cir. 2006), does not support his argument against waiver. Dunne highlights the Second Circuit's statement that "[o]nce the court is on notice of the inconsistency, each party has the choice of what to advocate and the court has the choice of what to do." *Id*. at 83. But that statement came in the context of an appeal in which the dissatisfied party—unlike Dunne— "brought the inconsistency to the court's attention at the earliest possible moment." *Id*. at 82. As a result, the Second Circuit rejected the argument that "when faced with an inconsistent verdict, the onus is on the dissatisfied party to *ensure* that the court keep the jury, or that by requesting a mistrial, a dissatisfied party waives appellate review of the inconsistent verdict." *Id*. at 83. As the Second Circuit explained, "[a] litigant preserves the issue for appeal by exposing the inconsistency before the jury is dismissed." *Ibid*.

But that is not what Dunne did. His inconsistency arguments are not preserved by the jury's redeliberation because he did not timely object to the jury's verdict. "In short, by raising [his] inconsistency argument for the first time in [his] post-trial motion papers filed long after the jury was excused, [Dunne] waived [his] objection." *Anderson Grp.*, 805 F.3d at 47.

In any event, Dunne has not shown that the jury's verdict is "ineluctably inconsistent" or that it constitutes "fundamental error" that undermines the integrity of the trial. Dunne's arguments with respect to Counts 1-4 imply that the jury must have found the exact same amount of liability for both an intentionally and a constructively fraudulent transfer.[41] But as the jury instructions stated, a transfer can be both intentionally and constructively fraudulent, and double

---

[41] *See, e.g.*, *id*. at 12 ("The finding for Count 2 fatally undermines and is irreconcilably inconsistent with the finding in Count 1 for the same transaction, on the same day, for the same property"); *id*. at 13 ("under Verdict Questions 3 and 4 the jury returned a verdict that valued the same property at the same time (date of the transfer) at two wholly inconstant amounts … there is no way to harmonize these two inconsistent liability amounts").

recovery was not permitted for the same transaction.[42] As a result, in cases in which the jury found Dunne engaged in both intentionally and constructively fraudulent transfers, it is appropriate to view the liability amounts for the same transaction together, in which case any perceived inconsistencies in the damages awarded can be logically explained.

With respect to Walford, there is a view of the case that makes the verdict in Counts 1 and 2 consistent: the jury found that Dunne engaged in intentional and constructive fraud in transferring Walford, but only assigned liability and damages with respect to intentional fraud to avoid a double recovery. The jury awarded €14,000,000 in damages against Killilea for Count 1, which is equal to the amount that the property was worth at the time of its disposition according to Killilea's schedule of transfers.[43] The jury did not award any damages with respect to Count 2, which, if the jury accepted a €14,000,000 valuation, would have resulted in a double recovery.

Despite Dunne's protestations, the jury's checking of "no" for liability in Count 2 does not necessarily mean that it found that Dunne transferred Walford to an unnamed "third party" in a way that renders the entire verdict inconsistent. It could, for example, mean that the jury did not assign liability for the constructive fraud count because it had already assigned full liability to Killilea for the intentional fraud count.[44]

Because this reasonable view of the case harmonizes the jury verdict, it is readily distinguishable from the case that Dunne raised at oral argument, *United States v. Pierce*, 940

---

[42] *See* Doc. #511 at 6-7 ("Keep this distinction in mind between an intentionally fraudulent transfer and a constructively fraudulent transfer because, for many of the transactions at issue in this case, you will be asked to consider whether the transaction is either intentionally fraudulent or constructively fraudulent *or both*") (emphasis added); *id.* at 32 (the jury may not "award double recovery or duplicative damage awards arising from the same loss or injury").

[43] Pl. Ex. 625 at 2; *see also* Doc. #582 at 121 (Tr. 121) (admitting exhibit).

[44] The remainder of Dunne's challenge to the Walford verdict in the Rule 49 section of his brief is with regard to the Irish High Court's recent ruling to be discussed below—not with any internal inconsistency in the jury's verdict. *See* Doc. #685 at 7-11.

F.3d 817 (2d Cir. 2019). In that criminal case, the Second Circuit held that acquittal was warranted because the jury returned a verdict that was "metaphysically impossible to reconcile" by finding the defendant guilty of conspiracy to possess with intent to distribute various narcotics, but also finding that the allegation that the defendant had conspired to distribute each of the relevant drugs was "not proven." *Id*. at 824. Those circumstances are simply inapplicable in this case.

Similarly, with respect to North Wall Quay, the jury's verdict can be reconciled by combining the €100,000 awarded in Count 3 and the €200,000 awarded in Count 4 for a total damages award of €300,000 related to the transaction. That total amount equals the value of North Wall Quay at the time of its disposition according to Killilea's schedule of transfers, just like the jury's total damages award with respect to Walford.[45] Dunne argues that this total award would be improper because the jury was instructed to "value the property at the time of the transfer not at the time of a subsequent transfer."[46] But he ignores that the instructions provide an exception that "[i]f the asset has appreciated since the transfer, then you should, in general, award damages for the appreciated value of the asset as it is today."[47] The jury's verdict could be read to find that the value of North Wall Quay appreciated after the fraudulent transfer, and therefore the jury awarded the Trustee damages for an intentionally and constructively fraudulent transfer based on the increased value pursuant to the jury instructions.

Although the Trustee stated that "[t]here seems to be a mistake" and the Court instructed the jury to redeliberate with respect to Counts 3 and 4, that does not mean the jury's verdict is

---

[45] Pl. Ex. 625 at 2.

[46] Doc. #685 at 13-14.

[47] Doc. #511 at 31. Notably, Dunne implicitly endorses the opposite approach with respect to Walford, which he does not argue should be valued at €57,950,000 when transferred rather than €14,000,000 at the date of disposal. *See* Pl. Ex. 625 at 2.

ineluctably inconsistent. The Trustee made that remark before seeing the amounts on the jury verdict form. The jury redeliberated with respect to this exact issue, with the instruction to "consider whether there's a basis in your deliberations for that. There may well be, in which case you would adhere to that."[48] The jury then reaffirmed its verdict. No party, including Dunne, objected to the verdict as inconsistent or requested that the Court inquire with more precision as to the jury's decision once they reviewed the verdict. Because there is an interpretation that harmonizes the jury's verdict with respect to each of these counts, it is not ineluctably inconsistent.

Finally, Dunne argues that the jury's findings related to corporate veil piercing and Counts 1-4 are irreconcilably inconsistent.[49] But as the Trustee argues, this is not a proper Rule 49 challenge because the jury was not asked to determine whether to pierce the veil for any of the entities Dunne argues were involved in the Walford or North Wall Quay transactions.[50] Under Dunne's theory, the jury could not have rendered *any* verdict that found Dunne fraudulently transferred these properties; therefore, his challenge is at most a challenge to the jury instructions and the verdict form. "Objection to an inconsistency between two general verdicts that is traced to an alleged error in the jury instruction or verdict sheet is properly made under Fed. R. Civ. P. 51. Yet to avail itself of relief under this Rule, a party must object before the jury retires to deliberate." *Jarvis v. Ford Motor Co.*, 283 F.3d 33, 56 (2d Cir. 2002) (Sotomayor, J.). Even a timely Rule 49 objection "cannot, as a matter of law, provide any relief for a party challenging a conflict between general verdicts based on an instruction given in the jury charge and repeated on the verdict sheet." *Ibid*. Dunne did not challenge the jury

---

[48] Doc. #610 at 8 (Tr. 2922).

[49] Doc. #571 at 23; Doc. #685 at 14-15.

[50] *See* Doc. #655 at 8-9

instructions and verdict sheet on these grounds, and therefore waived this challenge to the verdict.[51]

Moreover, Dunne's arguments do not even demonstrate that corporate veil piercing has any bearing on these transfers. With respect to North Wall Quay, the transfer document was signed by both Dunne and Killilea and does not indicate the capacity in which they signed it.[52] And as detailed below, the trial evidence was sufficient to sustain the jury's verdict that Dunne engaged in intentional and constructive fraud when he transferred North Wall Quay regardless of any involvement of corporate entities; there is no flaw or internal inconsistency within the verdict. For the Walford property, Dunne does not actually point to an entity that allegedly owned the property rather than himself. Therefore, veil-piercing has no bearing on Walford, and his argument is simply a restatement of his core claim that he was not the actual owner of Walford.

Accordingly, I will deny Dunne's motion to the extent that he seeks relief from inconsistent verdicts under Rule 49. He has waived these challenges to the jury verdict and the challenges also fail on the merits.

## C. *Dunne's motion for new trial or remittitur*

Dunne next argues that the Court should grant a new trial or remittitur pursuant to Rule 59 because the jury's verdict is contrary to law, because the Court improperly precluded Dunne's expert from testifying on material issues, and because the jury verdict is against the weight of the evidence for each of the counts that the jury found that Dunne engaged in a fraudulent transfer.[53]

---

[51] *See* Doc. #604 (charge conference transcript).

[52] Pl. Ex. 503; *see also* Doc. #592 at 68 (Tr. 1309) (admitting exhibit).

[53] Doc. #571 at 23-31; Doc. #685 at 15-20.

Rule 59(a) of the Federal Rules of Civil Procedure allows a court to grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). When evaluating a Rule 59 motion for new trial, a judge "may weigh the evidence and the credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner." *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012).

Dunne errantly argues that a new trial is warranted if the jury's verdict is "against the weight of the evidence," which he argues is simply a "preponderance" or "greater weight of the evidence."[54] But the cases that he relies on for that definition are from contexts unrelated to a motion for a new trial. *See De La Rosa v. Holder*, 598 F.3d 103, 108 (2d Cir. 2010) (discussing standard of review for Board of Immigration Appeals review of decisions by immigration judges); *Haltmier v. Commodity Futures Trading Comm'n*, 554 F.2d 556, 560 (2d Cir. 1977) (judicial review of agency decisions under the Commodity Exchange Act). As the Second Circuit explained in one of those cases, the term "'weight of the evidence' is often equated across circuits with a *de novo* inquiry into the preponderance of the evidence." *De La Rosa*, 598 F.3d at 108. That standard is plainly incompatible with the deferential standard applied to Rule 59 motions for a new trial.

Rather, the Second Circuit has emphasized that "trial judges must exercise their ability to weigh credibility with caution and great restraint, as a judge should rarely disturb a jury's evaluation of a witness's credibility, and may not freely substitute his or her assessment of the credibility of witnesses for that of the jury simply because the judge disagrees with the jury." *Raedle*, 670 F.3d at 418. "A trial court should not grant a motion for a new trial unless it is

---

[54] Doc. #571 at 23-24; Doc. #685 at 19.

convinced that the jury reached a seriously erroneous result or that the verdict is a miscarriage of justice," *Ali v. Kipp*, 891 F.3d 59, 64 (2d Cir. 2018), or "if substantial errors were made in admitting or excluding evidence." *Stampf v. Long Island R.R. Co.*, 761 F.3d 192, 202 (2d Cir. 2014). "It is well-settled that Rule 59 is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple.'" *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir. 1998).

I will address Dunne's arguments with respect to each of the transfers for which he seeks a new trial in turn.

### 1. *Walford*

Dunne first argues that a new trial is needed for Counts 1 and 2 regarding the Walford property because the jury's verdict finding that Dunne fraudulently transferred Walford is contrary to Irish law and because his expert, Professor John Wylie, was improperly precluded from testifying on material issues.[55]

In order to prove Count 1—that Dunne engaged in *intentional* fraud in transferring Walford—the Trustee needed to show by a preponderance of the evidence that Dunne 1) transferred it to a defendant or other third party no more than two years before he filed for bankruptcy; and 2) made the transfer with the actual intent to hinder, delay, or defraud his creditors.[56] In order to prove Count 2—that Dunne engaged in *constructive* fraud in transferring Walford—the Trustee needed to show by a preponderance of the evidence that 1) Dunne transferred it to a defendant or other third party no more than two years before he filed for bankruptcy; 2) that Dunne did not receive reasonably equivalent value for the transfer; and 3)

---

[55] Doc. #571 at 24-29.

[56] *See* Doc. #511 at 7-10.

when Dunne transferred Walford, he either was already insolvent or would become insolvent as a result of the transfer; was engaging in—or was about to start engaging in—business or a transaction for which he would have an unreasonably small amount of capital after the transfer; or intended to incur or believed that he would incur debts that would be beyond his ability to pay as they became due.[57]

Dunne focuses on the first prong of both the intentional and constructive fraud counts—that he must have made the transfer within two years of filing for bankruptcy—because he argues that he did not own Walford at all and therefore could not have transferred it. Dunne contends that the jury's verdict with respect to Walford was contrary to law because "under Irish law, [Dunne] was never the owner of that property and had no legal right or title in the property to effectuate the transfer," and "the weight of the evidence showed unequivocally that Dunne did not own the Walford property."[58]

Under Dunne's theory, he and Killilea entered into a postnuptial agreement in March 2005 "whereby Killilea as consideration for their marriage would receive from Dunne a portion of assets in Dunne's estate."[59] Dunne "contracted to purchase [the] Walford property for his wife" and "Killilea was the sole beneficial owner of Walford from the date of purchase."[60] "Walford was held in trust on behalf of Killilea subject to a Declaration of Trust," with Dunne initially as the trustee for Killilea as the beneficial owner.[61] In 2006, Matsack Nominees Limited replaced Dunne as the trustee of Walford, "relegating Dunne to third party status as to

---

[57] *Id*. at 14-17.

[58] Doc. #571 at 24-29.

[59] *Id*. at 11 (¶ 17).

[60] *Id*. at 11-12 (¶ 17).

[61] *Id*. at 12 (¶ 17).

Walford."[62] Dunne argues that "the overwhelming evidence elicited at trial was that Killilea was the beneficial owner since 2005 and no evidence to the contrary was elicited or presented by the Trustee," and that the "unchallenged 2005 transaction renders the Jury's Verdict contrary to law."[63]

But Dunne ignores the extensive evidence that the Trustee offered at trial to show that Dunne actually purchased Walford in his individual capacity in 2005, that the "Declaration of Trust" was fabricated, and that Dunne was the beneficial owner of Walford in his individual capacity until he transferred it to Killilea on March 29, 2013—the very same day he filed for bankruptcy in the District of Connecticut.[64] In particular, the Trustee showed that on July 1, 2005, the contract for the sale of Walford identified Sean Dunne as the "purchaser" and was signed by Paul Donnelly "as lawful attorney for Sean Dunne," without any reference to the purchase being in trust or in Dunne's capacity as trustee for Killilea.[65] Killilea agreed in trial testimony that "pursuant to this contract, Mr. Dunne was … committed to spending the full 57,950,000 euros whether [she] wanted to go through the deal or not" "because he didn't take it in or enter the contract in [her] name."[66] Dunne testified that he entered into the contract so that the sellers would "know that the purchaser had the capacity to complete the sale," and though he

---

[62] *Ibid*.

[63] *Id*. at 24, 26.

[64] *See* Doc. #655 at 11-16 (summarizing trial evidence). Many of these communications refer to "Queenstown," which was another name for the Walford property. *See, e.g.*, Doc. #588 at 174 (Tr. 1032).

[65] Def. Ex. 5596 at 3; *see also* Doc. #592 at 164 (Tr. 1405) (admitting exhibit); Doc. #594 at 155 (Tr. 1602) (Killilea admitting that Dunne is identified as the purchaser on the contract).

[66] Doc. #594 at 156 (Tr. 1603); Doc. #596 at 36 (Tr. 1698) (Dunne stating "I gave Paul power of attorney to sign on my behalf").

claimed that he was purchasing it in trust for Killilea, he was keeping that information from the sellers.[67]

The Trustee also details a number of communications between Dunne and his then-attorney, Patrick Sweetman, that took place after the "Declaration of Trust" was purportedly signed but that conspicuously omit mention of the Declaration of Trust or Killilea.[68] For example, in a letter of June 7, 2006 from Sweetman to Dunne, Sweetman stated that it could be possible to "provide a nominee company, Matsack Nominees Limited, which would acquire all of the site … that company having previously entered into a nominee agreement with you whereby it will acknowledge and agree that it holds the property as nominee for you. The nominee agreement would also require you to indemnify that company in respect of any public liability claims or other losses it might suffer by reason of acting as nominee."[69] The letter addressed Dunne as the party to enter into the nominee agreement, and it did not mention or copy Killilea.

In another example two years later, in an email exchange between Dunne and Sweetman on June 4, 2008, Dunne told Sweetman that legal fees for Walford work are "for my account."[70] In Sweetman's reply, he stated that "the Vendor's solicitor has been in touch with me yet again enquiring when you might call for a deed," and that he was "also very conscious that you have no protection as to your priority over the property, as we cannot register the contract without disclosing the owner, or register a deed until you call for one."[71] Again, the communications did

---

[67] Doc. #596 at 176-77 (Tr. 1838-39).

[68] Doc. #655 at 12-13.

[69] Pl. Ex. 998 at 1; *see also* Doc. #598 at 87 (Tr. 1979) (admitting exhibit).

[70] Pl. Ex. 987 at 2; *see also* Doc. #598 at 133 (Tr. 2025) (admitting exhibit).

[71] Pl. Ex. 987 at 1.

not mention the Declaration of Trust or Killilea, even though at this point according to Dunne he was simply "a third party without any ownership or connection to Walford."[72]

In October 2011, Dunne's new attorney, Donal T. McAuliffe, requested background from Sweetman, stating "[f]or the avoidance of doubt, we wish to clarify that the Contract dated 1/7/2005 was <u>not</u> signed by the Purchaser in trust but was signed beneficially by him by his duly appointed Attorney."[73] McAuliffe also requested that Sweetman "clearly set out the chain between the original Purchaser and Matsack Nominees Limited as this will, obviously, arise and I need to know the situation now."[74] In a letter response, Sweetman stated "[t]here is no chain between the original purchaser and Matsack Nominees Limited. The original purchaser is and remains the beneficial owner. Matsack Nominees Limited is simply acting as nominee and I hold a Nominee Agreement signed by the beneficial owner confirming the position."[75] Again, Sweetman did not reference any Declaration of Trust or Killilea.

In a follow-up letter of October 24, 2011, Sweetman told McAuliffe that "I confirm that the Contract was executed by Paul Donnelly on behalf of the principal as stated on the Contract."[76] Dunne admits that he was the principal referred to on that contract.[77] That same day, in an email to a potential purchaser of Walford, McAuliffe stated "Matsack Limited is acting as a Nominee for the original Purchaser who is and remains the beneficial owner of the above property. The original Contract was executed, on behalf of the beneficial owner, under Power of

---

72 Doc. #571 at 28.

73 Pl. Ex. 1534 (emphasis in original); *see also* Doc. #598 at 146 (Tr. 2038) (admitting exhibit).

74 Pl. Ex. 1534.

75 Pl. Ex. 1539; *see also* Doc. #598 at 149 (Tr. 2041) (admitting exhibit).

76 Pl. Ex. 1547; *see also* Doc. #598 at 151 (Tr. 2043) (admitting exhibit).

77 Doc. #598 at 151-52 (Tr. 2043-44).

Attorney."[78]

In November 2011, in separate communications, McAuliffe stated "[a]s far as I know there is no Declaration of Trust by S.D. in favour of G.D,"[79] and "to the best of my knowledge and information there is no written Declaration of Trust."[80] In February 2012, in response to a request from McAuliffe about the Declaration of Trust, Dunne responded "Gayle is looking for it as we moved so many times since it must be misfiled."[81]

In an April 2018 letter, Sweetman's prior law firm, Matheson, stated—in response to a request from Killilea to "confirm that Matheson always understood and acted on the basis that I was the beneficial owner of Walford from 1 July 2005 up until the date of its sale to Yesreb Holding Limited in March 2013"—that "Mr Sean Dunne was our client in respect of Walford … for the period prior to 4 October 2006. On that date we were instructed by Mr Dunne to 'forward new agreements on the basis that the property has been purchased in the name of Gayle Dunne and not [Sean] and Gayle as [joint] tenants.'"[82]

The letter from Matheson also stated that it was not in a position to confirm "that Sean Dunne did not transfer Walford to [Killilea], that it is Matheson's belief that [Killilea] was the original purchaser of Walford from the Duggan Estate and that Sean Dunne was the person who provided [her] with the funds (via Matheson) for the purchase."[83] It further stated "Mr. Sweetman was at no time advised of the existence of the Declaration of Trust of 23 July 2005 and only learned of its existence during the relevant interview [on January 30, 2017] with the

---

[78] Pl. Ex. 1546; *see also* Doc. #598 at 152 (Tr. 2044) (admitting exhibit).

[79] Pl. Ex. 1468; *see also* Doc. #598 at 159 (Tr. 2051) (admitting exhibit).

[80] Pl. Ex. 1419; *see also* Doc. #598 at 164 (Tr. 2056) (admitting exhibit).

[81] Pl. Ex. 531; *see also* Doc. #598 at 167 (Tr. 2059) (admitting exhibit).

[82] Pl. Ex. 1227 at 6 (emphasis omitted); *see also* Doc. #594 at 158 (Tr. 1605) (admitting exhibit).

[83] Pl. Ex. 1227 at 7.

Official Assignee notwithstanding its recital in the Deed of Conveyance."[84]

This evidence casts grave doubt on Dunne and Killilea's claims that Dunne purchased Walford as a trustee for Killilea pursuant to a Declaration of Trust and that he ceased to have any interest in the property by 2006, at the latest. If Dunne was the actual beneficial owner of Walford and did not purchase it as a trustee for Killilea, then Killilea would not have had a property interest that she could have transferred to Matsack Nominees Limited in 2006.

As Professor Wylie testified at trial, any assignment of Dunne's beneficial interest would have required a formal assignment in writing.[85] Dunne did not show evidence of any formal assignment of the interest. Accordingly, the jury reasonably could have decided that Dunne became the beneficial owner of Walford when he purchased it in 2005, and that he retained that interest until he transferred it to Killilea—or to Yesreb for the benefit of Killilea—on the same day as his bankruptcy petition in March 2013.

The Trustee also introduced evidence that showed that Dunne continued to be deeply involved in the management and potential sale of Walford leading up to and after he declared bankruptcy, despite his claims that he had been relegated to "third party" status in October 2006. In addition, the Trustee showed that Dunne expressed concerns on a number of occasions about his creditors finding out about Walford, and that the completion of the deed of conveyance and transfer of Walford to Yesreb closely coincided with his filing of his bankruptcy petition.

Communications from December 2012 and January 2013 show that Dunne was concerned about his failure to disclose the Walford purchase to NAMA in his statement of affairs. In December 2012, in response to a statement from Dunne that "[w]e need certainty on

---

[84] *Id*. at 9.

[85] Doc. #598 at 70 (Tr. 1962).

what if anything NAMA could achieve in a claim," Ross Connolly explained "the issue of what NAMA would or would not do is also complicated. In the worst case scenario NAMA could go to court seeking a garnishee order on the sales proceeds supported by the fact that substantially all of the proceeds on the acquisition were paid in 2006 and therefore the statement of affairs sworn in December 2010 was incorrect as it did not disclose this fact in its five year look back on transfers. … ultimately the only way to be sure of being safe is to close quietly and move the money out immediately."[86]

In a January 2013 email chain, Dunne recounted negotiations he was engaging in with a potential purchaser of Walford to McAuliffe, Connolly, and James Ryan, with Killilea not mentioned or copied.[87] In one email, Dunne instructed McAuliffe to "[a]dd the Nama clause that if Nama make[s] any claim on the contract once signed by GK, then GK reserves the right to rescind the contract. This covers the possibility of anybody on the purchasers side tipping off Nama once a contract is signed, as at that stage they will end up with the property anyway."[88]

On March 19, 2013, James Ryan emailed Totalserve Management Ltd., a Cyprus company that provided trustee services, stating in part that he "urgently" needed "a new standalone Cyprus company," which became Yesreb Holding Limited.[89] Ryan stated that "shares should be held in trust for Gayle Killilea Dunne," that "[t]he company will be acquiring an Irish property," and he identified Killilea as the "ultimate beneficial owner."[90] Shortly thereafter, Ryan amended the paperwork to name John Dunne—the son of Sean Dunne—as the sole

---

[86] Pl. Ex. 394; *see also* Doc. #588 at 173 (Tr. 1031) (admitting exhibit).

[87] Pl. Ex. 392; *see also* Doc. #588 at 175 (Tr. 1033) (admitting exhibit).

[88] Pl. Ex. 392 at 1.

[89] Pl. Ex. 1215 at 2, 4; *see also* Doc. #588 at 161 (Tr. 1019) (admitting exhibit).

[90] Pl. Ex. 1215 at 3, 6.

shareholder and ultimate beneficial owner of Yesreb.[91]

On March 29, 2013, the deed of conveyance was signed by Dunne, identified as the "original trustee," and Killilea, identified as the "beneficial owner," conveying the property to Yesreb.[92] Killilea admitted that no money changed hands in the transaction, but rather that the property was sold for €14,000,000 "by way of a loan note" which provided that Killilea would be paid back if and when Yesreb sold the property.[93]

That same day, Sean Dunne filed his bankruptcy petition in Connecticut. On May 3, 2013, Dunne filed under penalty of perjury a bankruptcy schedule with his assets and liabilities as of March 29, 2013.[94] The filing did not mention Walford at all, including when required to "list all real property in which the debtor has any legal, equitable, or future interest," "any property in which the debtor holds rights and powers exercisable for the debtor's own benefit," "all other property, other than property transferred in the ordinary course of the business or financial affairs of the debtor, transferred either absolutely or as security within **two years** immediately preceding the commencement of this case."[95] Dunne also admitted that he "never disclosed to NAMA that [he] had any involvement with Walford,"[96] and that he was concerned about disclosure to NAMA because "[he] never wanted [his] creditors to attach the proceeds of [his] wife or children."[97]

On May 16, 2013, Dunne emailed Seamus Reddan, the property manager for Walford,

---

[91] Pl. Ex. 1214 at 9-10; *see also* Doc. #588 at 164 (Tr. 1022) (admitting exhibit).

[92] Pl. Ex. 1183 at 2; *see also* Doc. #588 at 156 (Tr. 1014) (admitting exhibit).

[93] Doc. #588 at 166 (Tr. 1024); Doc. #594 at 47 (Tr. 1494).

[94] Pl. Ex. 1234; *see also* Doc. #582 at 112 (Tr. 112) (admitting exhibit).

[95] Pl. Ex. 1234 at 6, 43 (emphasis in original).

[96] Doc. #598 at 200 (Tr. 2092).

[97] Doc. #598 at 182 (Tr. 2074).

requesting in part that Reddan prepare materials for Ryan to bring to the United States so that "I can review," that Reddan deliver other records to McAuliffe, and that Reddan "[b]e available to deal with mad McKenzie at some stage down the road."[98] In his trial testimony, Dunne admitted that McAuliffe forwarded him an offer regarding the purchase of Walford in August 2016.[99]

In light of this evidence, there was an ample evidentiary basis for the jury's finding that Dunne engaged in intentional and constructive fraud when he transferred Walford on March 29, 2013. There was a strong evidentiary basis for the jury to conclude that Dunne was in fact the beneficial owner of Walford within two years of his bankruptcy petition because he had not actually signed a Declaration of Trust in 2005 transferring his interest to Killilea, and because he did not actually transfer his interest until the eve of the bankruptcy petition.

Additionally, there was a strong evidentiary basis to show that Dunne intended to hinder, delay, or defraud his bankruptcy creditors because of (1) the lack of actual payment involved in transferring Walford in 2013; (2) the close relationship between all parties involved in the transaction; (3) Dunne's continuous involvement in the management of Walford and efforts to sell it despite his claim that he was "out of the game" since 2006;[100] (4) Dunne's efforts to hide his involvement with Walford from NAMA and his creditors; and (5) the extremely close temporal proximity between signing of the deed of conveyance transferring Walford and Dunne's bankruptcy petition.

For substantially the same reasons, it was entirely reasonable for the jury to conclude that Dunne constructively defrauded his creditors because he did not receive a reasonably equivalent value when he transferred Walford to Killilea and because he was already insolvent and filed his

---

[98] Pl. Ex. 1312 at 1; *see also* Doc. #598 at 197 (Tr. 2089) (admitting exhibit).

[99] Doc. #598 at 200 (Tr. 2092).

[100] Doc. #598 at 156 (Tr. 2048).

bankruptcy petition practically simultaneously with the transfer.

To be sure, Dunne and Killilea marshaled evidence and made the case to the jury that "Gayle sold the property. And that property should be free and clear of any claim by the trustee."[101] They maintained that the Declaration of Trust was legitimately executed in July 2005, that Killilea was the beneficial owner of Walford all along, and that Dunne simply acted as Killilea's trustee until he was replaced by Matsack in October 2006. Dunne argued that his attorneys were incorrect when they stated that there was not a Declaration of Trust, and stated that there was only one copy which was kept by Killilea and that he had not needed it, which was why his attorneys did not have copies of it.[102] In response to the letter from Matheson, Killilea and Dunne claimed a "conspiracy" because, by the time that letter was written, Matheson was representing one of Dunne's creditors.[103]

But the verdict demonstrates that the jury simply did not believe the account advanced by Dunne and the Killilea defendants. And in light of the Trustee's extensive evidentiary showing, the jury had more than sufficient evidence to sustain its verdict with respect to Walford. The jury's verdict on Counts 1 and 2 was not seriously erroneous and will not result in a miscarriage of justice, and therefore I decline to disturb the jury's credibility determinations that are implicit in that verdict.

Dunne also argues that the jury was "confused" about Irish property law because the

---

[101] Doc. #605 at 114 (Tr. 2810).

[102] *See, e.g.*, Doc. #598 at 161, 166-67 (Tr. 2053, 2058-59).

[103] Doc. #594 at 160 (Tr. 1607) (related to April 2018 Matheson letter, Killilea stating "Matheson are acting for Ulster Bank at this stage, so I'm beginning to wonder if there's some kind of conspiracy going on between Matheson and the Official Assignee"); Doc. #598 at 173 (Tr. 2065) (in response to April 2018 Matheson letter, Dunne stating "[t]he way I read it, at this stage Matheson are acting for Ulster Bank. I don't know how they can or could, and they're in conflict with Gayle and they're representing a creditor of mine. Mr. Sweetman, it seems somebody on his behalf is trying to put a different slant on it.").

Court improperly precluded his expert, Professor Wylie, from referencing the facts or evidence of the case in his testimony.[104] I ruled on this precise issue when I granted in part and denied in part the Trustee's motion to preclude Wylie's testimony altogether. *See Coan v. Dunne*, 2019 WL 2169879 (D. Conn. 2019). For reasons detailed in that ruling and consistent with the principles in Federal Rule of Evidence 702, I allowed Wylie to "testify to the general background principles of Irish property, trust, and conveyancing law," but precluded him from "offer[ing] testimony that refers to or comments on the evidence in this case." *Id*. at *3. I explained that "if Wylie were permitted to base his testimony by reference to the particular documents and other evidence in this case, this would create an unnecessary risk of intrusion on both this Court's instructional role and the jury's fact-finding role." *Ibid*. Wylie did testify at trial, and his testimony informed the jury instructions on Irish law related to the Walford transaction.[105]

Dunne protests that the jury reached a different result than Wylie would have on the same facts, but he does not explain how allowing Wylie to testify to the particular facts in this case would not have intruded into the Court and the jury's roles, and he does not offer a serious argument for why the ruling limiting Wylie's testimony was a "substantial error." Therefore, Dunne's argument related to the scope of Wylie's testimony does not provide a basis for granting a new trial with respect to Walford.

Dunne's reply brief raises an additional argument for a new trial with respect to Walford: that the jury's verdict finding that Dunne fraudulently transferred Walford is precluded by a later judgment dated May 6, 2021 entered by Judge O'Connor on the Irish High Court.[106] That case involved a tax dispute between Yesreb and the Irish Revenue Commissioners related to the

---

[104] Doc. #571 at 26-27; Doc. #685 at 18.

[105] *See* Doc. #604 at 27, 32, 34, 36.

[106] Doc. #685 at 5, 8-12, 15-18.

collection of Irish stamp duties on property transfers.[107]

Judge O'Connor found, *inter alia*, that "Mr Dunne ceased to have any interest in Walford for Ms Dunne as of 9 October 2006" and "that the Commissioner was not in error in finding that Mr Dunne did not hold an interest in March 2013, whether for Ms Dunne or otherwise, in Walford. It is not necessary to investigate the motivation for including his name in the contract and the deed of conveyance."[108] Judge O'Connor also explained that "no interest in Walford passed to Mr Dunne in 2005. I accept that Mr Dunne simply undertook to transfer the interests which he had in the 2005 contract into the name of Ms Dunne 'or her nominee when called upon to do so'. Therefore, given the state of the evidence it is true that Mr Dunne's interest in the 2005 contract following the payment of a balance of the agreed sale price was held in trust for Ms Dunne."[109]

Dunne seizes on this ruling and argues that "[f]or this Court to now honor a jury verdict that is based upon the factually inaccurate premise that Dunne owned Walford in 2013 and then transferred that Property on the same day, at the same time, to two different persons (one unidentified) would pit the Court of the United States against the Law and Courts of Ireland, which is inappropriate and dangerous," and that "[c]omity requires this Court to respect the final decision of the Irish Courts and, accordingly, the jury verdict cannot stand."[110] He further argues that "[t]he Court should rule … that the Irish High Court Order has preclusive effect because the Trustee asked the jury to make a finding of fact on the issue of whether or not Dunne transferred ownership of Walford in 2013 notwithstanding evidence, testimony and Irish Court rulings that

---

[107] *See* Doc. #686-4.

[108] *Id.* at 26 (¶¶ 62-63).

[109] *Id*. at 22 (¶ 49).

[110] Doc. #685 at 5.

Dunne had previously alienated any ownership interests in that property in 2005."[111]

Although Dunne's briefing frames his argument as involving comity, that doctrine is inapplicable here for substantially the reasons stated by the Trustee.[112] Comity is "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws." *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 139 (2d Cir. 2014). "At the threshold, international comity comes into play only when there is a true conflict between American law and that of a foreign jurisdiction. A true conflict exists if compliance with the regulatory laws of both countries would be impossible." *In re Picard, Tr. for Liquidation of Bernard L. Madoff Inv. Sec. LLC*, 917 F.3d 85, 102 (2d Cir. 2019).

Dunne has not identified a true or actual conflict between American and Irish law. Rather, Dunne has simply identified a difference in factual determinations between this proceeding and a later Irish proceeding involving different legal issues and different parties. As the Trustee puts it, "the fact that the Irish High Court reached a conclusion that differs from the Jury, based on different evidence, involving different parties and concerning different legal issues does not evidence a conflict between Irish and U.S. law or implicate comity."[113]

Moreover, it would be one thing if comity were invoked as a reason for a U.S. court to defer to a foreign court's finding that has entered *before* the U.S. court has rendered a finding on the same issue. But here the jury has already rendered a verdict during the course of a fully contested trial at which Dunne was represented at all times by counsel and had a full opportunity

---

[111] *Id*. at 10.

[112] Doc. #692 at 4-5.

[113] *Id*. at 5.

to contest the Trustee's allegations. The principles of comity do not require U.S. courts to negate their own findings or judgments simply because an unhappy litigant is able to secure a later conflicting finding or judgment from a tribunal somewhere else in the world.

The cases that Dunne relies on are not to the contrary. In *Royal & Sun All. Ins. Co. of Canada v. Century Int'l Arms, Inc.*, 466 F.3d 88 (2d Cir. 2006), the Second Circuit explained that "[i]n the context of parallel proceedings in a foreign court, a district court should be guided by the principles upon which international comity is based: the proper respect for litigation in and the courts of a sovereign nation, fairness to litigants, and judicial efficiency." *Id.* at 94. But it noted that "[f]or two actions to be considered parallel, the parties in the actions need not be the same, but they must be substantially the same, litigating substantially the same issues in both actions." *Ibid.* And *Finanz AG Zurich v. Banco Economico S.A.*, 192 F.3d 240 (2d Cir. 1999), and *In re Maxwell Commc'n Corp. plc by Homan*, 93 F.3d 1036 (2d Cir. 1996), specifically invoked comity in the context of parallel foreign bankruptcy or liquidation proceedings.

Here, the Irish litigation was not a bankruptcy proceeding, and it involved completely different legal issues. It also involved different parties, and there was no party even superficially representing the Trustee's interests in that action. Therefore, the Irish litigation is not a "parallel proceeding," and the comity analysis Dunne urges is inapplicable.

Dunne framed the issue differently at oral argument, asserting that the Irish High Court ruling represents a change in Irish *law* with respect to Dunne's ownership interest in Walford and that, because it is an issue of law, the Court rather than the jury can decide the issue pursuant to Federal Rule of Civil Procedure 44.1. Under Dunne's theory, the "change" in law from the Irish High Court's opinion invalidates the jury's verdict in Counts 1 and 2 related to the Walford transaction.

Dunne's argument misunderstands the differences between issues of law, issues of fact, and mixed questions of law and fact. For the Walford-related counts, the jury was instructed to determine whether a fraudulent transfer took place under the U.S. Bankruptcy Code. As part of that determination, the jury had to consider a predicate issue of whether Dunne had a genuine ownership interest in Walford under principles of Irish law. This issue was raised well before trial, when the Trustee filed a notice pursuant to Federal Rule of Civil Procedure 44.1 that it "intends to raise issues of foreign law" including "the law of the Republic of Ireland in support of Plaintiff's claim alleged in the Complaint, with respect to Counts I and II (Avoidance of Fraudulent Transfer of Proceeds of Sale of Walford Property)."[114] The parties then submitted materials from experts and the Court heard expert testimony from Professor Wylie on principles of Irish law that could have bearing on the jury's determination of whether a fraudulent transfer occurred. I allowed Wylie to "testify to the general background principles of Irish property, trust, and conveyancing law" because "[i]f Wylie testifies about background legal concepts and practices, then the jury can decide how these concepts and practices apply, if at all, to the documents and fact testimony in this case." *Coan v. Dunne*, 2019 WL 2169879, at *3.

I instructed the jury that "[a]s to the Walford property, defendants contend that it was not the property of Sean Dunne because it was held by him as a trustee," and then—based on the parties' submissions as well as Wylie's testimony—detailed legal principles to inform the jury's factual determination of whether Dunne in fact owned Walford and whether he fraudulently transferred it.[115] That is the appropriate division of responsibility: pursuant to Rule 44.1, I determined the foreign law that could apply to the case and instructed the jury on it, but left any

---

[114] Doc. #133 at 1.

[115] Doc. #511 at 8-9.

factual determinations related to the transaction under that law to the jury.

Dunne does not cite any legal flaw in those instructions or change in those underlying legal principles of Irish law. He simply disputes the jury's implicit factual finding that he had an ownership interest in Walford until within two years of March 29, 2013. That issue is a factual finding, not a pure issue of law, just as the Irish High Court's ruling includes a different factual determination. Because Dunne challenges an implicit factual finding in the jury's verdict, not a controlling change in the governing law, there is no basis for me to reject the jury's verdict on Walford as a matter of law as Dunne urges. *See New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 111-12 (2d Cir. 2006) (explaining how "[t]he question of who owns a given item of personal property is a mixed question of law and fact" and that "[v]arious sets of legal principles may govern the determination of ownership under an established set of facts").

Dunne's argument is also flawed because it appears that the parties before the Irish High Court—Yesreb and the Irish Revenue Commissioners—essentially stipulated that Sean Dunne held Walford in trust for Killilea and then was fully divested of his interest prior to 2013, with support of an affidavit from Dunne. Specifically, Judge O'Connor noted that "[t]he parties in this appeal do not take issue now with the existence of the trust, whereby Mr Dunne held Walford in trust for Ms Dunne, despite the belief expressed by the Commissioner in her determination that insufficient evidence 'was adduced in support of the existence of a trust between Mr Dunne and his wife from 1 July 2005.'"[116] Judge O'Connor also stated "[i]ncluding Mr Dunne as a party to the 2013 conveyance does not rectify the factual situation accepted by him on an affidavit and all interested parties that his interest had ceased."[117]

---

[116] Doc. #686-4 at 16 (¶ 28).

[117] *Id*. at 27 (¶ 64).

There is no support for the argument that a stipulated fact accepted by foreign court represents a controlling change in law. Moreover, I am particularly troubled by the implication of Dunne's argument that suggests that a losing litigant is free after trial to seek a contrary finding in a different forum—without any involvement of the opposing party and on an uncontested record—and to use that finding to invalidate or undermine a prior federal court jury verdict.

Regardless of Dunne's framing, his fundamental argument that the jury's verdict with respect to Walford should be precluded is properly viewed as a collateral estoppel argument. To apply collateral estoppel offensively to preclude a party from relitigating an issue that has been previously decided, "(1) the issues in both proceedings must be identical, (2) the issue in the prior proceeding must have been actually litigated and actually decided, (3) there must have been a full and fair opportunity for litigation in the prior proceeding, and (4) the issue previously litigated must have been necessary to support a valid and final judgment on the merits." *Coan v. Dunne*, 2019 WL 2137459, at *1 (D. Conn. 2019). "In addition to these four factors, a court must also satisfy itself that application of offensive collateral estoppel is fair." *Ibid*.

Collateral estoppel is plainly inappropriate in this case. For the reasons I have just described related to the parties' stipulation before the Irish High Court, the issue of Dunne's ownership of Walford was not fully or fairly litigated in the Irish action. Additionally, the Trustee was not a party in the Irish action, nor was there any party in privity with the Trustee. It would also be unfair to apply this factual finding to preclude the jury's verdict two years after it was entered, even though the jury in this case was presented with extensive evidence related to the transaction and while it was essentially uncontested in the Irish proceeding. For all these reasons, I reject Dunne's argument that the jury's verdict should be negated by the recent Irish High Court decision.

Finally, Dunne's reply also suggests that the Trustee relies on "hearsay emails," but he does not reference any particular evidence or explain why it was improperly admitted.[118] "Generally speaking, specific reliance upon the trial transcript is necessary to demonstrate one's entitlement to relief on a Rule 59 motion based upon determinations made at trial." *Jo v. JPMC Specialty Mortg., LLC*, 369 F. Supp. 3d 511, 515 (W.D.N.Y. 2019) (collecting cases), *aff'd*, 818 F. App'x 103 (2d Cir. 2020). Dunne's vague and unsubstantiated argument cannot provide the basis for a "substantial error" in the Court's admission of evidence at trial.

Moreover, all of the exhibits I have referenced were admitted without objection. As I explained during trial:

> I really do count on attorneys to let me know if you do have a hearsay objection. I otherwise assume that you all may have discussed or have discussed essentially those issues in terms of that. … I want to put on the record my view that if a hearsay objection is not specifically called to my attention and if there is hearsay in a particular document, I consider the issue to have been waived, affirmatively waived by the counsel who is consenting to the admission of the document or who has not raised a specific objection on hearsay grounds to that exhibit.[119]

Because Dunne did not raise a hearsay objection to the admission of the exhibits supporting the Trustee's arguments and the jury's verdict, he has waived any such objection.

In sum, I will deny Dunne's motion for a new trial on Counts 1 and 2 related to Walford property.

### 2. *North Wall Quay*

Dunne argues that the jury's verdict on Counts 3 and 4 regarding North Wall Quay were against the weight of the evidence because he did not own North Wall Quay at the time of the transfer, but rather it was owned through his company Page Inns Limited, which is not a party in

---

[118] Doc. #685 at 18.

[119] Doc. #594 at 212-13 (Tr. 1659-60).

this proceeding.[120] But under the U.S. Bankruptcy Code, "[t]he trustee may avoid any transfer …

of an interest of the debtor in property … that was made or incurred on or within 2 years before

the date of the filing of the petition" if the debtor engaged in intentional or constructive fraud in

making the transfer. 11 U.S.C. § 548(a). Dunne undisputedly had an interest in North Wall Quay,

even if it was formally owned by Page Inns Limited, because Dunne's bankruptcy schedule filed

on May 3, 2013 listed a 100 percent holding in Page Inns Limited.[121]

Dunne also argues that the jury could not have found he engaged in a fraudulent transfer

to Killilea because the transfer actually occurred between his company and Killilea's company,

Amrakbo. But Dunne and Killilea each signed the transfer document, which does not indicate the

capacity in which they signed it.[122] Killilea listed the transfer on her personal schedule of

transfers "from S Dunne or related entities to his wife G Dunne."[123] The jury could have

reasonably concluded that Killilea was liable for damages for the transfer because Dunne

transferred the property to her company, supporting an inference that Dunne did so for her

benefit, and she in fact realized the benefit by claiming the property on her schedule of assets.[124]

Moreover, the trial evidence was sufficient overall to sustain the verdict that Dunne

engaged in intentional and constructive fraud when he transferred North Wall Quay to Killilea.

In addition to the evidence noted above, the transaction between spouses occurred when Dunne

was already insolvent in February 2012, about two weeks before Dunne consented to a

---

[120] Doc. #571 at 29-30.

[121] Pl. Ex. 1234 at 13, 50.

[122] Doc. #655 at 9-10 (citing Pl. Ex. 503).

[123] Pl. Ex. 625 at 2.

[124] *See* Doc. #511 at 29 (instructing the jury that "[i]f—and only if—you conclude that the Trustee has proven that Sean Dunne engaged in a fraudulent transfer, the Trustee is then entitled to recover from the initial transferee *or the person or entity for whose benefit such transfer was made*") (emphasis added).

€185,000,000 judgment in favor of NAMA, and less than two years before Dunne filed for bankruptcy. The transfer was for €100,000, but that consideration was never paid because the check was never cashed.[125] Even that €100,000 may have been a sharp undervaluation, as Killilea's schedule of transfers provided a €300,000 valuation,[126] and Killilea testified at trial that she later sold the property for €600,000.[127] In light of this evidence, the jury could have reasonably concluded that Dunne transferred North Wall Quay from his wholly owned company for the benefit of Killilea with the intent to hinder, delay, or defraud his creditors.

Dunne also argues that the jury verdict was flawed because the jury did not follow the jury instructions for calculating damages for North Wall Quay.[128] But as noted above, the jury's total damages award for North Wall Quay equals its value at the time of its disposition according to Killilea's schedule of transfers.[129] That is consistent with the jury instruction's guidance that "[i]f the asset has appreciated since the transfer, then you should, in general, award damages for the appreciated value of the asset as it is today."[130]

In sum, I conclude that the jury's verdict on Counts 3 and 4 was not seriously erroneous and would not result in a miscarriage of justice. Accordingly, I will deny Dunne's motion for a new trial on Counts 3 and 4 related to the North Wall Quay property.

### 3. *Lucy Partnership payments*

Dunne argues that part of the jury's verdict regarding a stream of payments and money

---

[125] Doc. #594 at 125-126 (Tr. 1572-73) (Killilea testimony).

[126] Pl. Ex. 625 at 2.

[127] Doc. #592 at 69-70 (Tr. 1310-11).

[128] Doc. #571 at 29-30.

[129] Pl. Ex. 625 at 2.

[130] Doc. #511 at 31.

transfers related to the "Lucy Partnership" were against the weight of the evidence.[131]

The jury's verdict addressed four counts related to the Lucy Partnership. In Count 9, the jury found that the Trustee had not proven that three transfers from Dunne to Killilea in August 2011, October 2011, and April 2012 were intentionally fraudulent in violation of the U.S. Bankruptcy Code.[132] However, in Count 10, the jury found that those same three transfers were constructively fraudulent in violation of the U.S. Bankruptcy Code, and it held Killilea liable for damages for the full amount of each of those transfers, totaling €258,000.[133] In Count 11, the jury found that the Trustee had not proven that three transfers from Dunne to Killilea in January 2010, May 2010, and July 2010 were intentionally fraudulent under Irish law.[134] But it found that two transfers in October 2010 and March 2011 were intentionally fraudulent under Irish law, and the jury held Killilea liable for damages for the full amount of each of those transfers, totaling €192,706.[135] And in Count 27, the jury found that, on various dates between July 2010 and November 2010, Dunne intentionally fraudulently transferred $278,297.18 to Killilea in violation of Connecticut law, and it held Killilea liable for damages in that full amount.[136]

Dunne argues that the jury "misconstrued the evidence regarding the Lucy Partnership Payments and transfer of money in 2010" because "[t]he evidence adduced at trial demonstrated that the Lucy Partnership payments and money transfers were under the obligations of a Swiss Court Order and Settlement in which Dunne was required to make payments to Killilea for

---

[131] Doc. #571 at 30.

[132] Doc. #509 at 3-4.

[133] *Id*. at 4-5.

[134] *Id*. at 5.

[135] *Id*. at 5-6.

[136] *Id*. at 9.

alimony," and therefore they could not be fraudulent transfers.[137] Similarly, in his disclosures to NAMA in March 2011, Dunne had stated "Assignment of Lucy Partnership income stream. This asset was assigned to comply with a Family Law maintenance Court order and cannot be reviewed or reversed."[138]

However, the Trustee introduced substantial evidence at trial to show that the Swiss court order that Dunne relied on was not binding and that Dunne in fact had begun making payments to Killilea related to the Lucy Partnership well before the Swiss family court entered its judgment. The Swiss judgment was entered on August 30, 2010 and "received" on October 5, 2010.[139] By its express terms, the agreement was nonbinding because it concerns "aspects regarding equity planning and settlement of the marital property with regard to which the Court cannot rule within these proceedings; Consequently, the agreements reached in this respect will simply be acknowledged to the spouses, without any enforceable judgment being issued."[140] Rather, the judgment simply ratified an agreement that Dunne and Killilea had formulated and presented to the Swiss court in 2010.

The Trustee also introduced evidence showing that the Lucy Partnership payments to Killilea began in 2009—before the settlement agreement and Swiss court judgment came into effect.[141] And the Trustee introduced evidence that Dunne transferred his interest in the Lucy

---

[137] Doc. #571 at 30.

[138] Pl. Ex. 1196 at 6; *see also* Doc. #600 at 45 (Tr. 2162) (admitting exhibit).

[139] Pl. Ex. 235 at 1; *see also* Doc. #589 at 111 (sealed Tr. 969) (admitting exhibit). To the extent that this ruling refers to limited portions of testimony that occurred during sealed proceedings or other evidence filed under seal, the Court concludes that there is not a compelling reason that warrants sealing or redacting those references in this ruling.

[140] Pl. Ex. 235 at 3.

[141] Pl. Ex. 625 (Killilea's schedule of transfers showing partnership cash distributions beginning in December 2009); Pl. Ex. 71-A (Killilea statement in April 2010 that she received disbursements from the Lucy Partnership in December 2009); *see also* Doc. #589 at 117 (sealed Tr. 975) (admitting exhibit).

Partnerships to Killilea for no consideration in March 2010.[142] Dunne admitted at trial that he did not list the Lucy Partnership transfers on his disclosures to NAMA because "we didn't list any cash transfers at that stage."[143] Killilea testified that she put the income stream in as a condition of the separation agreement in the Swiss family court to make it binding.[144]

This evidence cast doubt on Dunne's claim that he was simply making the payments required by a court order. It also controverted the statement in the family court judgment that Killilea "does not have personal income"[145] and Killilea's similar representations at trial that "I don't recall coming into an income position until late 2010."[146]

Instead, the record reveals a strong evidentiary basis for the jury's findings that certain of Dunne's transfers of the Lucy Partnership income stream were fraudulent. The evidence supports the inference that the separation agreement was devised to protect assets from Dunne's creditors, that the Lucy Partnership payments were not actually pursuant to a court order, and that Dunne and/or Killilea sought the Swiss court judgment in order to be able to argue to creditors—as Dunne eventually did—that the assignment of the income stream was irreversible.

Notably, the jury's verdict principally found transfers *after* the August 2010 Swiss court order to be fraudulent, even though the Trustee argued that all transfers of the income stream were fraudulent. The verdict strongly suggests that the jury found Dunne and Killilea's actions pursuing and securing the non-binding Swiss court judgment to be a decisive factor that made the transfers fraudulent. It also reflects a careful weighing of the evidence and a discerning

---

[142] Pl. Ex. 1192; *see also* Doc. #591 at 134 (sealed Tr. 1179) (admitting exhibit).

[143] Doc. #600 at 40-41 (Tr. 2157-58).

[144] Doc. #593 at 49 (sealed Tr. 1290).

[145] Pl. Ex. 235 at 2, 8.

[146] Doc. #589 at 118 (sealed Tr. 976).

verdict. *See Jennings v. Town of Stratford*, 263 F. Supp. 3d 391, 406 n.4 (D. Conn. 2017) ("[a]s the jury's verdict form reflects, it did not rule in plaintiff's favor with respect to all of his claims … This is consistent with the Court's conclusion that the jury carefully weighed and discerned its judgment from the mix of evidence.").

All in all, Dunne has not demonstrated that the jury's verdict with respect to the Lucy Partnership payments and money transfers is seriously erroneous or will result in a miscarriage of justice, and I will deny his motion for a new trial on those counts.

### 4. *Credit Suisse transfers*

In Count 21, the jury found that Dunne engaged in an intentionally fraudulent money transfer under Irish law when €3,015,000 was transferred from his joint account with Killilea to her individual account on October 28, 2008, and held Killilea liable for €3,015,000 in damages for that transfer.[147]

Dunne argues that the jury's verdict related to transfers from Dunne's Credit Suisse account with Killilea to Killilea's individual account was against the weight of the evidence because "Dunne had no claim to the funds."[148] But Dunne does not offer any evidence to support that statement beyond Killilea's testimony that Dunne "treated it as [her] account" and "didn't treat the account as his own."[149] The jury may have simply not credited Killilea's testimony that the €3,015,000 was only hers—notwithstanding that she also acknowledged that it was in a joint account. And if Dunne indeed did not treat the account as his own, the jury had reason to doubt why it would have been necessary for Killilea to transfer the funds to her individual Credit Suisse account in October 2008.

---

[147] Doc. #509 at 8.

[148] Doc. #571 at 30.

[149] Doc. #590 at 158 (Tr. 1203).

The jury's verdict finding that the ultimate transfer to Killilea's individual account was fraudulent is also bolstered by the Trustee's evidence that the money flowing into the joint account, and then to the individual account, was derived from Dunne's assets. Specifically, the €3,015,000 that was transferred on October 28, 2008 originated from transfers by Dunne from Mountbrook Homes Limited into Dunne and Killilea's joint Credit Suisse account between June 2008 and July 2008.[150] Dunne admitted at trial that he did not list the cash transfers on his disclosures to NAMA because he viewed them as cash transfers that somehow did not need to be reported.[151] Dunne now states that "Killilea owned Mountbrook Homes Limited."[152] But Killilea listed the transfers on her personal schedule of transfers "from S Dunne or related entities to his wife G Dunne."[153] And at trial, Killilea testified that she did not receive her ownership interest in Mountbrook until October 2008—after the transfers from Mountbrook into the joint account.[154] The jury reasonably could have concluded that the funds sent to the joint account were Dunne's, and that the series of transfers—culminating in the €3,015,000 transfer to Killilea's individual account—were intended to hinder, delay, or defraud Dunne's creditors.

Dunne also argues that "[a]t the very least, because the account was a joint account, Killilea and Dunne shared ownership of the funds in the Credit Suisse account and the maximum that could be enforced against Dunne would be 50% of the account transfer."[155] Not only is that at odds with the evidence that the funds transferred into the joint Credit Suisse account were

---

[150] Pl. Ex. 1752; *see also* Doc. #590 at 157 (Tr. 1202) (admitting exhibit); *id*. at 159-60 (Tr. 1204-05) (Killilea agreeing that Dunne transferred the money from Mountbrook to the joint account); *id*. at 161 (Tr. 1206) (Killilea testifying "[t]hat's the same 3 million" that was "coming in from the joint account to [her] personal account").

[151] Doc. #600 at 40-41 (Tr. 2157-58).

[152] Doc. #571 at 14 (¶ 23).

[153] Pl. Ex. 625 at 2.

[154] Doc. #596 at 199 (Tr. 1861)

[155] Doc. #571 at 30.

Dunne's to begin with, but Dunne does not cite any caselaw to support his argument. In reality, transferring assets into joint accounts does not cleanse the transaction of any fraud or reduce the amount of liability for a fraudulent transfer. *See, e.g., In re Titus*, 916 F.3d 293, 300 (3d Cir. 2019) ("When a spouse conveys individual property to a tenancy by the entireties in fraud of creditors, the creditor may nevertheless execute against the property so conveyed. Numerous courts have applied this rule to hold an insolvent debtor's spouse personally liable for a fraudulent transfer.").

Overall, Dunne has not made a showing that the jury's verdict with respect to the Credit Suisse transfers was seriously erroneous or would result in a miscarriage of justice. Accordingly, I will deny his motion for a new trial with respect to Count 21 related to the Credit Suisse transfers.

### 5. IGB Lands

In Count 25, the jury found that Dunne engaged in an intentionally fraudulent transfer under Irish law when he transferred his 50% interest in IGB Lands to Killilea in October 2008, but the jury did not hold any defendants liable for the transfer.[156]

Dunne argues that the jury's verdict with respect to IGB Lands was against the weight of the evidence because "the Jury ignored Dunne's 2005 Postnuptial Agreement" pursuant to which Dunne transferred his interests in the IGB Lands.[157] But there was no evidence at trial that such a postnuptial agreement is binding in any way under Irish law. Indeed, in the context of prenuptial agreements, evidence submitted at trial showed one of Dunne's own lawyers advising that there is "absolutely no Law or Act in existence in Ireland at present which states that such a document

---

[156] Doc. #509 at 9.

[157] Doc. #571 at 31.

has any legal force or impact on a Court in the event of a separation or divorce."[158]

Moreover, the three-page, handwritten postnuptial agreement is not even binding by its own terms, in which Dunne stated in part: "I reserve the right to retain ownership of all these properties and transfer the value as cash or alternatively properties at values to be agreed between us."[159] Dunne testified that he was "endeavoring in this document to give [Killilea] gifts."[160]

Other trial evidence also suggested that Dunne's interest in IGB Lands was not transferred in 2005 pursuant to the postnuptial agreement. For example, defendants' solvency expert, Craig Jacobson, testified that IGB Lands "was owned by Mr. Dunne. But at some point in 2008 the ownership changed."[161] Killilea's personal schedule of transfers "from S Dunne or related entities to his wife G Dunne" listed a €2,700,000 transfer of IGB Lands as occurring on December 9, 2008.[162]

In short, the 2005 postnuptial agreement—which was discussed extensively at trial and the jury had ample opportunity to consider—does not demonstrate that the jury's verdict is seriously erroneous or resulting in a miscarriage of justice.[163] Accordingly, I will deny Dunne's motion for a new trial on Count 25 related to IGB Lands.

---

[158] Def. Ex. 5501; *see also* Doc. #596 at 10 (Tr. 1672) (admitting exhibit).

[159] Def. Ex. 5502; *see also* Doc. #584 at 154 (Tr. 370) (admitting exhibit).

[160] Doc. #596 at 167 (Tr. 1829).

[161] Doc. #602 at 25 (Tr. 2315).

[162] Pl. Ex. 625 at 2.

[163] To the extent that Dunne argues in reply that the jury's verdict on the counts related to IGB Lands are inconsistent, *see* Doc. #685, he has waived that argument—both by not raising it as an inconsistent verdict prior to the Court excusing the jury and by failing to include the argument in his motion. The trial evidence and the Trustee's briefing do suggest that the IGB Lands transfer may have taken place in December 2008 rather than in or around October 2008 as indicated on the verdict sheet. But there is no occasion to consider any prejudice or error that could have resulted from a potential typographical error on the verdict form because Dunne has waived any such challenge.

### 6. Remittitur

Dunne also makes a cursory argument that the Court should grant remittitur pursuant to Rule 59.[164] But Dunne does not make any particularized request for why or in what amount remittitur is warranted. In any event, because I conclude that the jury's verdict is well-supported and not excessive for the reasons discussed above, there is no basis for remittitur. Accordingly, for all the reasons set forth above, I will deny Dunne's motion for a new trial under Rule 59.

### D. Dunne's motion for judgment notwithstanding the verdict

Alternatively, Dunne seeks judgment notwithstanding the verdict pursuant to Federal Rule of Civil Procedure 50, which he appears to confuse with a judgment as a matter of law.[165] "A party may only assert a renewed claim for judgment as a matter of law under Rule 50(b) if it previously raised that specific issue during trial in a Rule 50(a) motion." *Munn v. Hotchkiss Sch.*, 24 F. Supp. 3d 155, 182 (D. Conn. 2014), *aff'd*, 724 F. App'x 25 (2d Cir. 2018). Dunne did not file a Rule 50(a) motion during trial, nor did he join the Killilea defendants' Rule 50(a) motion.[166] Therefore, he cannot pursue a post-trial Rule 50 motion for judgment as a matter of law. Even if Dunne had preserved a Rule 50 challenge, he would not meet the "heavy burden" it requires for the reasons already discussed in the context of the more generous standard for a Rule 59 motion. *See generally Jennings v. Town of Stratford*, 263 F. Supp. 3d at 402-03, 405.

Accordingly, I will deny Dunne's motion to the extent it seeks relief under Rule 50. Because Dunne has not demonstrated any grounds for post-verdict relief, I will deny his motion in its entirety.

---

[164] Doc. #571 at 6, 19, 31; Doc. #685 at 23.

[165] Doc. #571 at 20, 31; Doc. #685 at 23.

[166] *See* Doc. #491 at 10.

## II.   Trustee's motion for prejudgment interest

The Trustee moves for an award of prejudgment interest on the transfers that the jury found to be fraudulent under federal bankruptcy law and Irish law.[167] "The decision whether to grant prejudgment interest and the rate used if such interest is granted are matters confided to the district court's broad discretion." *In re Palermo*, 739 F.3d 99, 106 (2d Cir. 2014). The Second Circuit has explained that "the question of whether prejudgment interest should be awarded in an avoidance and recovery action brought under federal bankruptcy law is an open one in our Court. Many of the courts in this Circuit look to the source of the law underlying plaintiff's claims: claims that arise out of federal law are governed by federal rules, claims arising out of state law are governed by state rules." *Id.* at 107.

Starting with the federal law claims, the jury held Killilea liable for damages for six transfers for which it found that Dunne engaged in intentionally or constructively fraudulent transfers under the U.S. Bankruptcy Code.[168] "Although there is no specific reference to prejudgment interest in the Bankruptcy Code, courts have typically relied on the word 'value' in section 550(a) as authorizing an award of interest." *In re 1031 Tax Grp., LLC*, 439 B.R. 84, 87 (Bankr. S.D.N.Y. 2010) (collecting cases). "Courts in the Second Circuit … have recognized that the award of prejudgment interest is discretionary, and absent a sound reason to deny prejudgment interest, such interest should be awarded." *Ibid.* (same).

---

[167] Doc. #627. Although the Trustee initially also sought an award of prejudgment interest on the damages for Count 27, for which the jury held that Sean Dunne engaged in a money transfer that was intentionally fraudulent under Connecticut law, the Trustee conceded at oral argument that he had abandoned that claim because the Killilea defendants correctly argued that such claims for prejudgment interest under Conn. Gen. Stat. § 37–3a are treated as compensatory damages claims that must be submitted to the trial jury. *See, e.g., Ferguson v. Fairfield Caterers, Inc.*, 2015 WL 2406156, at *11 (D. Conn. 2015).

[168] Specifically, the jury's verdict on Counts 1, 3, 4, and 10 found that a total of six of Dunne's transfers were intentionally or constructively fraudulent in violation of the U.S. Bankruptcy Code, and it awarded the Trustee €14,558,000 in damages against Killilea for those counts. *See* Doc. #509.

The Second Circuit has explained that a discretionary award of prejudgment interest "should be a function of (i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." *Wickham Contracting Co. v. Loc. Union No. 3, Int'l Bhd. of Elec. Workers, AFL-CIO*, 955 F.2d 831, 833-34 (2d Cir. 1992). "The purpose of prejudgment interest is not to punish Defendants or to provide Plaintiff with a windfall, rather prejudgment interest is an element of the plaintiff's complete compensation that aims to make the plaintiff whole." *In re FKF 3, LLC*, 2018 WL 5292131, at *12 (S.D.N.Y. 2018).

As an initial matter, I will decline to award prejudgment interest for the Walford transfer because, as the Killilea defendants argue, additional claims related to that transfer were settled in February 2020 after the jury's verdict.[169] Although the Trustee was not an official party to the settlement agreement, the OA was, and the settlement agreement provided for the vast majority of the settlement funds—more than €11.5 million—to go toward a global settlement or toward securing the judgment in this action.[170] Under the settlement agreement, "all Parties hereby release and forever discharge/waive, all and/or any actions, claims, rights, demands and set-offs, whether in this jurisdiction or any other, whether or not presently known that they, their related parties or any of them ever had, or hereafter can, shall or may have against the other Party or any of their related parties arising out of or connected" to Walford.[171] Although Yesreb, not Killilea, entered into the settlement agreement, Yesreb is the entity that Walford was transferred to on the

---

[169] Doc. #630 at 2-3, 12. Sean Dunne also filed an opposition to the Trustee's motion, but his opposition is based entirely on arguments discussed above related to his motion for post-trial relief. *See* Doc. #631.

[170] Doc. #628-1 at 4-5 (¶ 6).

[171] *Id*. at 4 (¶ 5).

same day that Dunne filed for bankruptcy. To the extent that the OA and the Trustee are both pursuing claims related to the bankruptcy action on behalf of Dunne's creditors, the broad release language appears to cover a not-yet-asserted claim for prejudgment interest.

Moreover, even if the release language does not directly cover a claim for prejudgment interest in this action, the settlement agreement weighs against exercising my discretion to impose prejudgment interest related to the jury's damages award for Walford. In entering into the settlement agreement, the OA determined that the creditors would be fairly and reasonably compensated by an agreement amount that did not include prejudgment interest. The fairness factor does not weigh in favor of awarding prejudgment interest in these circumstances. Additionally, the Trustee does not respond to the Killilea defendants' argument with any reason why prejudgment interest should be awarded notwithstanding the Walford settlement. Accordingly, I will deny the Trustee's motion for prejudgment interest on the jury's Walford damages award.

As to the other fraudulent transfers under the U.S. Bankruptcy Code, however, the *Wickham* factors weigh in favor of an award of prejudgment interest. Dunne's creditors will probably never be fully compensated for their losses, but an award of prejudgment interest in this case will more adequately compensate the creditors for the lost value of the funds they would have been entitled to absent Dunne's fraudulent transfers. *See In re FKF 3, LLC*, 2018 WL 5292131, at *13. The equities in this case are squarely on the side of the creditors, who were defrauded, have suffered major losses, and have continued to be deprived of their assets throughout this protracted litigation. Dunne's fraudulent transfers and dishonest disclosures hindered the Trustee's collection efforts, and they were compounded by Dunne's improper closing of email accounts in 2013, which led to my giving the jury an adverse inference jury

instruction.[172] Moreover, the purpose of the fraudulent conveyance statute is remedial—it is to avoid transactions that were made to hinder, delay, or defraud creditors.

The Killilea defendants argue that the Trustee is not entitled to prejudgment interest because "the Adversary Complaint did not seek interest" and because "the issue of interest was not presented to the fact finder."[173] But the Trustee did not waive recovery of prejudgment interest because "[c]ourts in this Circuit regularly grant a prevailing party's request for prejudgment interest even where the prevailing party did not include the demand in its pleadings." *In re FKF 3, LLC*, 2018 WL 5292131, at *12. And the Killilea defendants do not cite any authority that supports their assertion that prejudgment interest can only be awarded if the issue is presented to the jury, and at oral argument agreed that the decision of whether to award prejudgment interest remains in my discretion. As a result, the Trustee may be granted an award of prejudgment interest for his claims under the U.S. Bankruptcy Code even though he did not include a request for prejudgment interest in his complaint or present it to the jury.

The Killilea defendants also argue that prejudgment interest is not warranted because "there was no basis to establish a claim that Killilea intended to hinder or delay the creditors or the Trustee."[174] But prejudgment interest is awarded to compensate creditors, and it does not require a finding that the transferee engaged in fraud. *See, e.g., Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 624 B.R. 55, 63 (Bankr. S.D.N.Y. 2020) (rejecting argument that prejudgment interest was not warranted when defendants were "victims of the Ponzi scheme" because "the purpose of prejudgment interest is to make the Plaintiff whole rather than to punish Defendants or to provide Plaintiff with a windfall").

---

[172] *See* Doc. #511 at 32.

[173] Doc. #630 at 8-9.

[174] *Id.* at 9.

The Killilea defendants further suggest that it would be inequitable to award prejudgment interest because "[t]he Trustee did not promptly pursue his claims against Killilea, engaged in an international scorched earth litigation strategy designed more to make an example of Killilea than to maximize recovery for the Estate, delayed prosecution of his claims to the extent possible, and repeatedly sought to delay the trial of this action."[175] I do not agree. Although there have been some delays, the Trustee has prosecuted this complex action over nearly a decade in the face of significant resistance and obstruction by Dunne. Because the purpose of prejudgment interest is to compensate Dunne's defrauded creditors, it is his obstruction and the effects it has had on the resolution of this litigation that are most relevant to determining whether prejudgment interest is warranted. Accordingly, for all these reasons and in light of my consideration of all the *Wickham* factors, I will grant the Trustee's motion for prejudgment interest on the five remaining fraudulent transfer claims under the U.S. Bankruptcy Code.

The parties also dispute the rate of prejudgment interest that should apply and the time interval for which prejudgment interest should apply. These determinations are committed to the Court's discretion. *See In re Palermo*, 739 F.3d at 107 n.5. The Trustee argues that the Court should award prejudgment interest from the date of each transfer,[176] while the Killilea defendants argue that any prejudgment interest should begin to accrue, at the earliest, on the date the Trustee commenced the adversary proceedings.[177]

There is authority to support each position. "Bankruptcy courts have generally awarded prejudgment interest in fraudulent transfer actions from the time the demand is made or from the time an adversary proceeding is initiated. However, some cases appear to suggest that interest

---

[175] *Id.* at 3.

[176] Doc. #627 at 8-13; Doc. #636 at 4-5.

[177] Doc. #630 at 4.

will be awarded from the date of the transfer where both the transferee and the debtor act together in concert to defraud the debtor's creditors." *In re All Am. Petroleum Corp.*, 259 B.R. 6, 20 (Bankr. E.D.N.Y. 2001). But on balance I am persuaded that awarding prejudgment interest as of the date of the bankruptcy filing is most appropriate. *See, e.g., In re FKF 3, LLC*, 2018 WL 5292131, at *14 ("[T]he fraudulent conveyance claims here arose only in the context of [the] bankruptcy proceeding, and Plaintiff could only assert its claims arising under section 548 of the Bankruptcy Code upon the filing of the bankruptcy petition. … Thus, the Court finds it appropriate to calculate prejudgment interest on the fraudulent conveyance claims from the Petition Date."). Similarly, in this action the Trustee has acknowledged that his claims accrued on the petition date, March 29, 2013.[178]

As to the rate of prejudgment interest, "[w]hile section 1961 of Title 28 establishes the rate of interest that is to be paid 'on any money judgment in a civil case recovered in a district court,' there is no federal statute that governs the appropriate rate of prejudgment interest." *In re 1031 Tax Grp., LLC*, 439 B.R. at 88. "Accordingly, courts in this district have adopted several different methodologies for determining an appropriate rate of prejudgment interest," including using the treasury-bill rate embodied in 28 U.S.C. § 1961, the state statutory rate, the fixed interest rate imposed by the Internal Revenue Service in calculating interest on tax underpayment, and the prime, or market rate, based on the bank prime loan rate. *Id.* at 88-89 (collecting cases).

The Killilea defendants argue that the current treasury-bill rate for post-judgment interest under 28 U.S.C. § 1961 should apply, which is currently 0.08%.[179] However, "[w]here the

---

[178] Doc. #621 at 6-7 n.3.

[179] *See* Board of Governors of the Federal Reserve System, Selected Interest Rates (Daily) – H.15, available at https://www.federalreserve.gov/releases/h15/ [https://perma.cc/55WD-2FXL] (last accessed July 15, 2021).

interest rate codified in 28 U.S.C. § 1961 is too low to compensate the plaintiff, courts can opt to apply the prime rate of interest." *In re FKF 3, LLC*, 2018 WL 5292131, at \*13. Based on the equitable considerations in this case and the compensatory purpose of prejudgment interest, I conclude that the rate under 28 U.S.C. § 1961 is too low to compensate the creditors and that applying the prime interest rate will more fully and fairly compensate the Trustee for the opportunity costs of the fraudulently transferred funds.

Accordingly, I will award prejudgment interest based on the prime rate of interest on the petition date, which was a 3.25% annual rate.[180] *See id*. at \*15 (awarding prejudgment interest at prime rate as of date of filing of bankruptcy petition); *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 624 B.R. 55, 65-66 (Bankr. S.D.N.Y. 2020). I calculate a total prejudgment interest award of €150,694.40 on the fraudulent transfers under the U.S. Bankruptcy Code.[181]

Next, the Trustee seeks prejudgment interest for the three transfers for which the jury found that Dunne engaged in intentional fraud under the Irish law and held Killilea liable for damages.[182] The parties agree that the Court has discretion to award prejudgment interest for the Irish law claims at an annual rate of 8% from the date of accrual until December 31, 2016, and

---

[180] *See* Federal Reserve Economic Data, Bank Prime Loan Rate Changes: Historical Dates of Changes and Rates, available at https://fred.stlouisfed.org/series/PRIME [https://perma.cc/XCD4-BC33] (last accessed July 15, 2021). The rate is also currently 3.25%.

[181] This calculation is based on a total principal amount of €558,000 for the jury's verdict for Counts 3, 4, and 10, with an annual rate of 3.25% applied from the bankruptcy petition date, March 29, 2013, through the date of judgment, July 19, 2021 (a period of eight years and 113 days). The Trustee's motion does not specify whether he seeks compound or simple interest. In the absence of any argument in favor of compound interest and in light of my granting the Trustee an award of prejudgment interest at the more adequate prime rate, I conclude in my discretion that an award of simple interest is warranted for the federal claims in this case. *See In re FKF 3, LLC*, 2018 WL 5292131, at \*15 (awarding prejudgment interest on fraudulent transfer claims at the prime rate without compounding).

[182] Specifically, the jury's verdict on Counts 11 and 21 found that a total of three of Dunne's transfers were intentionally fraudulent under Irish law, and it awarded the Trustee €3,207,706 in damages against Killilea for those counts. *See* Doc. #509.

2% thereafter until the date of judgment.[183] In a case cited by defendants, *First Active Plc v. Brian Cunningham*, IESC 11 [2018], the Irish Supreme Court explained that "factors [that] may be relevant to the exercise of the court's discretion, either in the granting of interest *per se* or in respect of the period for which interest may be appropriate," include the "nature of the case," the "reasons why the debt was not discharged at an earlier date," the "reason for the passage of time or delay in the processing of the litigation," the "desire to achieve full restoration, but no more, for the judgment creditor," and the "avoidance of penalising the judgment debtor." *Id*. at ¶ 62. The Irish Supreme Court added that "[t]hese are but examples of matters that may be relevant in determining how the section [regarding prejudgment interest] may be appropriately utilised so as to achieve just compensation for the successful party." *Ibid*.

These Irish law factors are similar to the *Wickham* factors, and I will award the Trustee prejudgment interest on the jury's verdict for the Irish law claims for substantially the reasons discussed above. The Killilea defendants protest that this would be punitive and that Irish law does not allow prejudgment interest to be used punitively.[184] But the reason for granting prejudgment interest in this action is not to punish Killilea; as I have already explained, it is to achieve just compensation for Dunne's creditors, and I conclude that an award of prejudgment interest in this action serves that end and is appropriate based on my assessment of the nature of this case.

As to the time interval for prejudgment interest, the Killilea defendants argue that prejudgment interest should only be awarded as of the date of the Trustee's motion or at the earliest when the Trustee filed his Irish law claims in 2015. I disagree with this approach and see

---

[183] Doc. #627 at 8; Doc. #630 at 15-16.

[184] Doc. #630 at 16.

no reason not to award prejudgment interest dating back to the date the claims accrued for the same reasons discussed above. The Trustee should not be deprived of some prejudgment interest because he did not necessarily know to bring certain claims—potentially due to Dunne's obstruction and dishonest disclosures—until after Dunne's bankruptcy petition was filed, especially because the intentionally fraudulent transfers occurred years before the Irish law claims accrued.[185]

Accordingly, I will grant the Trustee's motion for prejudgment interest on the three intentionally fraudulent transfers under Irish law at a rate of 8% from March 29, 2013 to December 31, 2016, and at a rate of 2% thereafter until the date judgment is entered. I calculate a total prejudgment interest award of €1,256,535.21 on the fraudulent transfers under Irish law.[186]

In sum, I will grant in part and deny in part the Trustee's motion for prejudgment interest. Specifically, I will deny the Trustee's motion for prejudgment interest on Counts 1 and 27. But I will grant the Trustee's motion for prejudgment interest at the rates and periods detailed above on the fraudulent transfers under the U.S. Bankruptcy Code in Counts 3, 4, and 10, and the fraudulent transfers under Irish law in Counts 11 and 21. Prejudgment interest shall be awarded to the Trustee against Killilea in the total amount of €1,407,229.60.

### III.     *Trustee's equitable claims*

The Trustee seeks entry of judgment on his pending equitable claims and requests for

---

[185] The Trustee does not argue that the Irish law claims accrued at a different date than the U.S. Bankruptcy Code claims, so I assume for purposes of this ruling that they also accrued when Dunne filed for bankruptcy in the United States.

[186] This calculation is based on a total principal amount of €3,207,706 for the jury's verdict for Counts 11 and 21, with an annual rate of 8% applied from the bankruptcy petition date, March 29, 2013, through December 31, 2016 (a period of three years and 278 days), and an annual rate of 2% applied from January 1, 2017 through the date of judgment, July 19, 2021 (a period of four years and 200 days). Compound interest is not authorized under the Irish statute governing prejudgment interest. *See First Active Plc v. Brian Cunningham*, IESC 11 [2018], at ¶ 33 (quoting Courts Act 1981 § 22(2)).

relief that were not submitted to the jury.[187] Specifically, the Trustee seeks entry of judgment on his claims for unjust enrichment against Killilea, an accounting by Dunne and Killilea, and a constructive trust over the 22 Stillman Lane property. I will address each equitable claim in turn.

### A. Unjust enrichment

Under Connecticut law, "[u]njust enrichment is, consistent with the principles of equity, a broad and flexible remedy. Plaintiffs seeking recovery for unjust enrichment must prove (1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment." *Horner v. Bagnell*, 324 Conn. 695, 708 (2017). "The measure of damages in an unjust enrichment case ordinarily is not the loss to the plaintiff but the benefit to the defendant." *Id*. at 708 n.12. Although a "fraudulent transfer claim shares many features of a claim for unjust enrichment," "courts have refused to dismiss unjust enrichment claims on the basis that they were duplicative of fraudulent transfer claims, noting that it is conceivable that the plaintiff could recover under one theory but not the other." *In re Hellas Telecommunications (Luxembourg) II SCA*, 535 B.R. 543, 585 (Bankr. S.D.N.Y. 2015).

Similarly, under Irish law, the parties agree that a plaintiff may succeed on a claim for unjust enrichment by establishing (1) that a defendant received a benefit, (2) at the expense of the plaintiff, and (3) that it would be unjust to allow the defendant to retain the benefit.[188]

The Trustee argues that Killilea was unjustly enriched on a variety of grounds, including by (1) profits generated by Mountbrook USA's construction and development; (2) "excessive" salary transfers that Killilea received from Dunne's company, DCD Builders; (3) money

---

[187] Doc. #524. Although the Trustee's filing is styled as a "brief," at times I will refer to it as a motion for simplicity.
[188] *See* Doc. #524 at 8; Doc. #683 at 19.

transfers that Killilea received from Amrakbo; (4) the money Killilea received from selling the D4 Hotel furniture and fixtures that Dunne allegedly transferred to Killilea for no consideration; and (5) sales proceeds for the Swiss Condominiums.[189]

Starting with the Trustee's unjust enrichment claims related to Mountbrook USA's profits, Killilea's salary from DCD Builders, money transfers from Amrakbo, and the proceeds from sale of the D4 Hotels furniture and fixtures, I conclude that the Trustee cannot bring these claims as set out in the Trustee's briefing because they are not within the scope of the operative complaints. The unjust enrichment count of the complaint in the bankruptcy adversary proceeding incorporated the complaints' earlier allegations, and then states:

> Dunne's transfer and/or concealment of the *afore alleged* monies, real properties, personal property and other assets to and by Killilea has benefited Killilea personally and financially, and Killilea unjustly failed to compensate Dunne for the benefits she has received, and Killilea's failure to compensate Dunne for those benefits was to detriment of Dunne's bankruptcy estate.

> As a result, Killilea has been unjustly enriched to the extent of the value of the assets transferred to Killilea and concealed through Killilea.[190]

In other words, the operative complaints limit the unjust enrichment claims to allegations supporting the fraudulent transfers alleged in the operative complaints. The Trustee does not point to any allegations in the operative complaints related to Killilea's salary from DCD Builders, money transfers from Amrakbo, or the proceeds from sale of the D4 Hotels furniture and fixtures. I have already ruled that the Trustee "may not pursue any claims that he has not alleged in the operative complaints in this case."[191] *Coan v. Dunne*, 2019 WL 1976146, at *2 (D. Conn. 2019). Indeed, with respect to Amrakbo, I have already held that the Trustee "may not add

---

[189] Doc. #524 at 2.

[190] Doc. #189 at 50-51 (¶¶ 311-13) to *Coan v. Killilea*, No. 15-05019 (Bankr. D. Conn. 2016) (emphasis added); *see also* Doc. #1-1 at 20 (¶¶ 82-85) (NALM's state court complaint alleging similar unjust enrichment claims).

[191] Doc. #442 at 29-31.

new claims against Amrakbo," because "Amrakbo is not a party to this case, nor does the Trustee allege that Amrakbo was, itself, fraudulently transferred." *Ibid.* Accordingly, I conclude as a matter of law that the Trustee is not entitled to a finding of unjust enrichment related to Killilea's DCD Builders' salary, the Amrakbo money transfers, and D4 Hotels-related sales proceeds.

Similarly, the Trustee argues that Killilea was unjustly enriched by Mountbrook USA's profits because "[t]he evidence showed that Dunne controlled, directed and supervised the various Mountbrook USA development and construction projects"[192] and because "the Debtor's labor, experience and acumen were the driving force behind the profits generated by the Mountbrook USA real estate development projects."[193] The Trustee further argues that "under Connecticut law Killilea and her insider entities may be held liable for the amounts by which they were unjustly enriched on account of the Debtor's contribution to those projects, including labor and other efforts."[194] But even assuming that is an accurate statement of the law, I have already held—albeit over the Trustee's objection—that this "fruits of labor" theory is outside the bounds of the operative complaints and therefore not actionable in this case.[195]

Moreover, this theory is contradicted by the Trustee's repeated assertions earlier in this litigation that the unjust enrichment claims are premised on the transfer of assets from Dunne to Killilea. For example, at the pretrial conference, the Trustee explained that "the factual basis for

---

[192] Doc. #524 at 11.

[193] Doc. #696 at 5.

[194] *Id.* at 2-3.

[195] *See* Doc. #604 at 51-58, 166-69. To the extent that the Trustee's complaint may have pleaded an unjust enrichment claim related to Mountbrook USA that is premised on the same evidence as the Trustee's claims alleging that Dunne fraudulently transferred his membership interest in Mountbrook USA, I deem those claims to be waived because the Trustee's brief on equitable claims does seek relief on that type of claim. Furthermore, I would be unlikely to find that Killilea was unjustly enriched by transfers that the jury found not to be fraudulent, especially given that the jury also found that the Trustee had not proven that Mountbrook USA's corporate veil should be pierced. *See* Doc. #509 at 6, 10.

the unjust enrichment is part and parcel of Mr. Dunne's entire asset transfer scheme from the very beginning. So it's just … a continuation of that and it's a tracing of those assets that again were used by Mr. Dunne to, we allege, build this house. If it's proven that the funding of that building, that house, was totally separate and distinct from any of this enormous wealth that Mr. Dunne transferred to his wife, then of course we wouldn't be able to prove our case."[196] Accordingly, I conclude as a matter of law that the Trustee is not entitled to a finding of unjust enrichment with respect to the Mountbrook USA-related profits and that there is an insufficient evidentiary basis for any such claim in light of the Trustee's failure to prove fraudulent transfers at trial with respect to or related to Mountbrook USA.

As to the Trustee's unjust enrichment claim related to the Swiss Condominiums, the Trustee argues that Killilea was unjustly enriched by the proceeds from the sale of the Condominiums for two primary reasons. First, the Trustee argues that Killilea was unjustly enriched because Dunne caused the downpayments to be made for the properties from his DCD Builder's account and from his and Killilea's joint Credit Suisse account in 2007.[197] But again, this theory related to earlier payments by Dunne is not actionable because it was not pleaded in the operative complaints.[198]

Second, the Trustee argues that Killilea was unjustly enriched with respect to the Swiss Condominiums because Dunne "donated his one-half interest in the Condominium to Killilea" a

---

[196] Doc. #442 at 61; *see also* Doc. #443 at 42-43 ("I think that for a significant amount of this testimony, the testimony comes in for both the legal counts and the equitable counts because of the nature of the history in terms of transferring of assets from one person to another in certain circumstances where they may be recoverable as fraudulent conveyances, they may be transfers that are recoverable pursuant to unjust enrichment claims, that parties could be unjustly enriched based upon those transfers, they could be transfers in name only and therefore go to the facts that need to support an equitable determination by Your Honor.").

[197] Doc. #524 at 17-18.

[198] *See* Doc. #1-1 at 7-8, 16-17; Doc. #189 at 21-22, 43-44 to *Coan v. Killilea*, No. 15-05019 (Bankr. D. Conn. 2016).

few months before the Condominiums were sold.[199] This is the only unjust enrichment claim for which the Trustee seeks an entry of judgment that is within the scope of the operative complaints. I make the following findings of fact pursuant to Federal Rule of Civil Procedure 52(a)(1) with respect to this claim.

Killilea testified at trial that she reached an agreement with Dunne and the mortgage lender for the Swiss Condominiums in February 2009 to take Dunne off the title and mortgage to the Condominiums.[200] Under the agreement, "in order to get [Dunne] off the mortgage, his liability off the mortgage, [Killilea had] to pay down the mortgage in the sum of about 700,000 Swiss francs."[201] After Killilea made the payment, Dunne was released from the mortgage and Killilea became the sole person obligated on the mortgage as well as the sole owner of the Condominiums.[202] In Count 17, the jury found that the Trustee had not proven that Dunne engaged in an intentionally fraudulent transfer of his interest in the Swiss Condominiums in violation of Irish law.[203]

I have thoroughly considered the full trial record and all of the parties' submissions, and I have also taken into strong consideration the jury's verdict on the fraudulent transfer claim in Count 17. I conclude as a matter of law pursuant to Federal Rule of Civil Procedure 52(a)(1) that the Trustee has not proven his unjust enrichment claim related to the Swiss Condominiums. The trial evidence discussed above credibly established that Killilea paid value for Dunne's one-half interest in the Swiss Condominiums by paying down the mortgage on the property in order to

---

[199] Doc. #524 at 18.

[200] Doc. #594 at 56 (Tr. 1503).

[201] *Ibid*.

[202] *Id*. at 57 (Tr. 1504).

[203] Doc. #509 at 7.

release Dunne from the mortgage. Accordingly, the Trustee did not prove that Killilea unjustly did not pay Dunne for this interest in the Condominiums; nor did the Trustee prove that it would be unjust or inequitable for Killilea to retain the proceeds of the later sale of the Condominiums. In light of this evidence, just as the jury was not persuaded that Dunne's transfer of his ownership interest was fraudulent, I am not persuaded that Killilea was unjustly enriched by her receipt of Dunne's ownership interest and her subsequent sale of the Swiss Condominiums. Although it is theoretically conceivable that the Trustee could recover under a theory of unjust enrichment but not fraudulent conveyance, I conclude that the Trustee has not made a showing under principles of equity that warrants a favorable entry of judgment on his unjust enrichment claim related to the Swiss Condominiums in this case.

Accordingly, I will deny the Trustee's claims for unjust enrichment related to the Swiss Condominiums. Because the Trustee has not proven any unjust enrichment claim that was alleged in the operative complaints, I will deny the Trustee's unjust enrichment claims in their entirety.

### B. Accounting

The Trustee requests that the Court order Dunne and Killilea to render an accounting.[204] "An accounting is an equitable remedy defined as an adjustment of the accounts of the parties and a rendering of a judgment for the balance ascertained to be due." *Censor v. ASC Techs. of Connecticut, LLC*, 900 F. Supp. 2d 181, 216 (D. Conn. 2012). "To support an action of accounting, *one* of several conditions must exist. There must be a fiduciary relationship, *or* the existence of a mutual and/or complicated accounts, *or* a need of discovery, *or* some other special ground of equitable jurisdiction such as fraud." *Manere v. Collins*, 200 Conn. App. 356, 372

---

[204] Doc. #524 at 18-20.

(2020) (emphasis in original). However, "[a]n accounting is not available in an action where the amount due is readily ascertainable. Equity will ordinarily take jurisdiction to settle the account if the facts create a reasonable doubt whether adequate relief may be obtained at law." *Id*. at 371-72. "Under current law, an accounting is not mandatory merely because it is requested: many situations may require a formal judicial accounting; in others, discovery may suffice." *Chioffi v. Martin*, 181 Conn. App. 111, 146 (2018).

The Trustee argues that he is entitled to an accounting essentially by virtue of the fact that the request was pleaded in the complaint and because the jury returned a verdict that included findings that Dunne engaged in fraudulent transfers.[205] But as the Killilea defendants argue, that alone is insufficient to support the Trustee's request because an accounting is not mandatory and the Trustee has not argued that the amount due is not ascertainable.[206]

Indeed, the Trustee received substantial financial discovery from the Killilea defendants through this litigation, and the jury returned a verdict for specific amounts based on its findings that certain transfers were fraudulent. While the Trustee argues that Killilea's financial disclosures date back to 2018 and an accounting is needed for Killilea's current assets, he does not explain what aspect of the jury's verdict or his equitable claims entitles him to this relief. The Trustee does not argue that an accounting would somehow reveal evidence of further claims that would be actionable by the bankruptcy estate; nor does he argue that the Killilea defendants will not be able to satisfy the judgment absent an accounting.

As a result, it is unclear what an accounting would accomplish here, and I will deny the Trustee's motion with respect to Killilea. *See, e.g.*, *Manere*, 200 Conn. App. at 373 (finding a

---

[205] *Ibid.*; Doc. #696 at 6.

[206] Doc. #683 at 31-32.

claim for accounting unavailable because claimant "could ascertain the amount of money that it was due" after "receiv[ing] further accounting information … through discovery" that allowed claimant to "reconstruct BAHR's finances both through the documents provided … and the records obtained by banking institutions").

Likewise, as to Dunne, I am not persuaded that an accounting would serve any useful purpose at this point—especially because the Trustee does not argue that Dunne actually still owns substantial assets, such that for an accounting to help trace Dunne's assets it would necessarily need to involve an accounting from other parties. As noted above, I previously denied Dunne's motion to be dismissed from this action because "[i]f the fraudulent transfer claims are proved at trial, there is no sensible basis to conclude that Dunne—as a prime participant in all that allegedly happened—should not be responsible among others to render an accounting. Dunne's presence and participation would be essential to an accounting." *Coan v. Dunne*, 2019 WL 1513461, at *2. That holding was premised on there being a need for an accounting including other parties in response to the jury verdict as a matter of equity. But because I conclude that an accounting is not a necessary remedy for Killilea, I conclude that an accounting by Dunne alone is not necessary at this stage, either. Accordingly, I will deny the Trustee's request for an accounting from Killilea and Dunne.

### C. Constructive trust

The Trustee requests that the Court "impose a constructive trust on assets located in this jurisdiction."[207] The Trustee's briefing is confusing as to whether he seeks a constructive trust as a separate cause of action or as a remedy.[208] To the extent that the Trustee seeks a constructive

---

[207] Doc. #524 at 20.

[208] *Compare id*. at 21 (seeking entry of judgment on Count "XXX (Constructive trust)") *with id.* at 22 (requesting that the Court "[o]rder a constructive trust over WAHL LLC, the nominal owner of 22 Stillman Lane").

trust as a separate cause of action, I will deny his claim because—as I have already explained in this case—"a constructive trust is a remedy, not an independent substantive cause of action." *Coan v. Dunne*, 2019 WL 1976146, at *5.

The Trustee is otherwise unclear about the property for which he seeks the imposition of a constructive trust, and the only property that is explicitly referenced in his briefing is 22 Stillman Lane.[209] A constructive trust is not available as a matter of course when unjust enrichment is proven, as the Trustee's briefing implies.[210] Instead, as the Connecticut Supreme Court has explained, a "constructive trust permits the claimant to assert ownership of (i) specifically identifiable property for which the defendant is liable in restitution or (ii) its traceable product. A claimant who can show unjust enrichment, but who cannot identify such property in the hands of the defendant, is not entitled to the remedy of constructive trust." *Wall Sys., Inc. v. Pompa*, 324 Conn. 718, 742 (2017). "A claimant seeking a constructive trust must identify property in the hands of the defendant that represents or embodies property obtained at the claimant's expense or in violation of the claimant's rights." *Id*. at 742-43.

The Trustee does not have a sound basis for any claim related directly to 22 Stillman Lane. The jury concluded that the Trustee had not proven a fraudulent transfer for which he was entitled to the return of the 22 Stillman Lane property.[211] It also declined to hold Mountbrook USA, the developer of 22 Stillman Lane, or Wahl, the title-holder and owner of the property, liable for any fraudulent transfers.[212] And it found that the Trustee had not proven that Wahl or Mountbrook USA's corporate veils should be pierced under instrumentality or identity

---

[209] *See id*. at 3, 22.

[210] *Id*. at 20-21.

[211] Doc. #509 at 10.

[212] *Id.* at 1-10.

theories.[213] Indeed, the Trustee's theory, as explained to the Court, was that 22 Stillman Lane would be subject to subsequent transferee liability if the jury concluded that Dunne owned Mountbrook USA.[214] Therefore, a constructive trust is not warranted because the Trustee has not proven that Killilea or Wahl are liable in restitution for this property, or that 22 Stillman Lane is otherwise the traceable product of property for which Killilea or Wahl are liable in restitution.

Outside of 22 Stillman Lane, the Trustee has not identified any other property for which a constructive trust could be warranted. Accordingly, I will deny the Trustee's motion to the extent that it seeks the imposition of a constructive trust. Because I conclude that the Trustee is not entitled to the equitable relief that he seeks, I will deny his claims for equitable relief in their entirety.[215]

## IV.    *Remaining issues*

In light of my determinations on the foregoing issues, it appears there are no further substantive issues to take up with respect to this bankruptcy adversary proceeding. At oral argument on the pending issues on July 7, 2021, the Killilea defendants stated that they may wish to file a post-trial motion challenging the jury verdict. I am not convinced that further delaying entry of judgment in this case and further protracting this litigation is warranted in order to allow the Killilea defendants more time to file such a motion.

In June 2019, following the jury trial, I initially postponed post-trial briefing for 45 days to allow the parties to engage in global settlement talks.[216] Although I allowed the parties leeway

---

[213] *Id*. at 6-7, 10.

[214] Doc. #604 at 65.

[215] The Trustee purports to continue to seek "declaratory relief by the same measure," Doc. #524 at 9 n.5, but does not offer any particularized reason why declaratory relief is warranted in this case. Because I conclude that the other equitable relief the Trustee seeks is not warranted, I will likewise deny the Trustee's motion to the extent that it continues to maintain any related claims for declaratory relief.

[216] *See* Doc. #518 (docket order on June 14, 2019 stating that "[t]he Court otherwise STAYS post-trial briefing for

with respect to post-trial briefing deadlines and motion practice over the past two years based on their representations that they were close to a global settlement, the extension of those settlement discussions did not constitute an indefinite stay on post-trial motion practice and I did not enter any order indefinitely staying post-trial motions.[217]

In March 2020, I denied the Killilea defendants' mid-trial motion pursuant to Federal Rule of Civil Procedure 50(a) for judgment as a matter of law in light of the jury's verdict and "without prejudice to the Court's consideration of any timely post-trial motions pursuant to Fed. R. Civ. P. 50(b) or other provisions of the Federal Rules of Civil Procedure."[218] The Killilea defendants have not filed any such motion.

Since November 2020, the Killilea defendants have sought relief from the Court in the form of an objection to Judge Garfinkel's ruling granting the Trustee prejudgment remedies and a motion for discharge of the *lis pendens* on 22 Stillman Lane. They have also opposed the Trustee's equitable claims and motion for prejudgment interest. In May 2021, the Court held a status conference on the pending issues and to discuss how to move the case toward final resolution, but the Killilea defendants did not raise the need for a post-trial briefing schedule at that status conference.[219] The Court then set a briefing and oral argument schedule for the remaining issues in this case—including Dunne's motion for post-verdict relief—based on the

---

45 days pending the parties' report of the status of proceedings before Judge Spector"); Doc. #520 at 10 ("I'm going to postpone the briefing for a 45-day buffer period to allow Judge Spector to see if something can be worked out"); *id*. at 12 ("I'm staying further briefing for the next 45 days except as to the trustee's filing of briefing on the equitable claims").

[217] In November 2019, I granted in part the Trustee's motion to stay briefing on Dunne's motion for post-verdict relief until Dunne complied with the Court's spoliation sanctions order and until either the resolution of the Trustee's motion for prejudgment remedies or the termination of the parties' settlement discussions. Doc. #581. That stay did not affect the Killilea defendants' right to file post-trial motions. *See ibid*. In any event, that stay was lifted on January 28, 2021 when Judge Garfinkel ruled on the Trustee's motion for prejudgment remedies. Doc. #642. On February 4, 2021, I set a briefing schedule with respect to Dunne's motion. Doc. #646.

[218] Doc. #617.

[219] *See* Doc. #680 (May 4, 2021 status conference transcript).

parties' representations at the status conference as to what issues remained in this case.[220]

In sum, the Killilea defendants had ample opportunity to file a motion for post-trial relief at any point in the past two years, but they have not done so. At oral argument on July 7, 2021, I advised the Killilea defendants that I intended to rule on the pending issues quickly and that if they intended to file additional post-trial motions, they should seek leave to file any such motion in short order. They have not done so to date. Based on all of these considerations and the circumstances of this case, I conclude that there is not good cause to further delay entry of judgment to allow the Killilea defendants to file a post-trial challenge to the jury verdict and to further prolong litigation of this case that has been already been pending for six-and-a-half years, including for more than two years since the jury returned its verdict.

Accordingly, I will instruct the Clerk of Court to enter judgment on July 19, 2021 and to close this case. The Clerk of Court shall enter the judgment in Euros and dollars as reflected by the jury's verdict and in this ruling without any currency conversion. Although historically "American courts rarely enter judgments in a foreign currency... there is no longer any reason courts cannot enter judgment in a foreign currency" absent special circumstances. *Yukos Cap. S.A.R.L. v. Samaraneftegaz*, 592 F. App'x 8, 12 (2d Cir. 2014); *see also* Restatement (Fourth) of Foreign Relations Law § 490 n.4 ("[w]hen a mandatory rule... does not bind a court, the court will decide whether to convert the judgment based on the interests of the parties as well as the practical considerations raised by conversion of a foreign currency").

In this case, there are no circumstances that would mandate entering judgment in any particular currency. *See, e.g.*, *Dye v. Kopiec*, 2019 WL 2527218, at *5 (S.D.N.Y. 2019) (courts

---

[220] *See* Doc. #672; Doc. #673.

sitting in diversity must apply state-law rule for conversion of foreign-currency).[221] I conclude that it is appropriate under the circumstances of this case to enter judgment in currencies consistent with the jury verdict, including entering judgment in Euros for Counts 1, 3, 4, 10, 11, and 21, and any accompanying prejudgment interest. That is consistent with the transactions at issue, which were principally denominated in Euros, and the way the financial analysis in this case was presented to the jury. Practically, it avoids issues related to exchange rate fluctuations between Euros and dollars over this case's long history. And entering judgment "in euros without conversion to U.S. dollars" for those counts also "best respects the will of the jury which calculated the amount of damages in euros." *Liberty Media Corp. v. Vivendi Universal, S.A.*, 2013 WL 105776, at *3 & n.26 (S.D.N.Y. 2013).

Because the imminent entry of judgment obviates the need for a prejudgment remedy, I will overrule as moot the Killilea defendants' objection to Judge Garfinkel's ruling on the Trustee's motion for post-verdict, prejudgment remedies. Because the jury did not award the Trustee return of the property at 22 Stillman Lane and because I am denying the Trustee's equitable claims with respect to that property, there is no longer a pending action "intended to affect real property" under Conn. Gen. Stat. § 52-325(a). Accordingly, I will grant Killilea and Wahl's motion to discharge the *lis pendens* on the property subject to their proposed stipulation and assurances in briefing and at oral argument that the proceeds of any sale will be available as security and/or to satisfy the judgment against Killilea in this case.[222]

---

[221] The result would be no different if Connecticut law were to control this issue because Connecticut follows the Uniform Foreign-Money Claims Act, which provides that generally "a judgment or arbitration award shall be stated in an amount of the money of the claim" without currency conversion. Conn. Gen. Stat. § 50a-57(a); *see also* Restatement (Fourth) of Foreign Relations Law § 490 n.3.

[222] *See* Doc. #629 at 2, 5; Doc. #629-2 (proposed stipulation); Doc. #638 at 4-5 (stating "the Lis Pendens should be discharged so that Killilea and Wahl may sell the Stillman Property and use the proceeds of the sale to further secure the jury verdict as proposed in their prior draft stipulation. Killilea and Wahl believe that such a sale in the current market is likely to generate at least $4 million in net proceeds which can be delivered to the Trustee to be held either

To the extent that the Killilea defendants or any other party believe that they have reserved the right to file further post-trial briefs or that there are other substantive issues that should have been taken up by this Court before the entry of final judgment, they may file a motion for reconsideration or motion to re-open the judgment by no later than 14 days after the entry of judgment. Any such motion should provide a particularized showing of both why the relief sought has been procedurally preserved and why the relief is substantively warranted. To the extent that such a motion might seek leave to file yet a new challenge to the jury's verdict, the motion should take into account the analysis in the Court's ruling on Dunne's motion for post-verdict relief and not simply restate challenges that the Court has already rejected. In the event that the judgment in this case is re-opened, the Court may consider whether to further extend the period for which prejudgment interest is awarded at the prime rate (rather than the post-judgment interest rate under 28 U.S.C. § 1961).

## CONCLUSION

For the reasons set forth above, the Court:

- DENIES Sean Dunne's motion for post-verdict relief (Doc. #570) in its entirety.

- GRANTS in part and DENIES in part the Trustee's motion for prejudgment interest (Doc. #627). Prejudgment interest shall be awarded to the Trustee against Killilea in the total amount of €1,407,229.60. In light of the mathematical complexity of the prejudgment interest award calculations in this case, if any party believes that this ruling is based upon a clear computational error, they are encouraged to file a timely motion for reconsideration or motion to re-open the judgment rather than litigating a claimed error of math in the first instance on appeal.

- DENIES the Trustee the relief he seeks in his brief on equitable claims (Doc. #524).

_____

to fund a settlement of this matter or as security for the Trustee's claims if no settlement is achieved by the parties").

- OVERRULES as moot the Killilea defendants' objection to Judge Garfinkel's ruling on the Trustee's motion for post-verdict, prejudgment remedies (Doc. #647).

- GRANTS Killilea and Wahl's motion to discharge the *lis pendens* (Doc. #629) on 22 Stillman Lane subject to their proposed stipulation and representations that the proceeds of any sale of the property will be provided to the Trustee to secure and/or satisfy the judgment in this case.

I have considered all other arguments raised by the parties in relation to these issues even if the arguments are not expressly discussed in this ruling.

The Clerk of Court shall enter judgment on July 19, 2021 in accordance with the jury's verdict (Doc. #509) as well as this ruling. Final judgment shall enter against Killilea in the total amount of €19,172,935.60 and $278,297.18. Upon separate entry of judgment, the Clerk of Court shall close this case. If any party has a good-faith basis to file a motion for reconsideration or a motion to re-open the judgment consistent with the limitations discussed in this ruling, they may file such a motion by no later than **14 days from the entry of judgment.**

It is so ordered.

Dated at New Haven this 15th day of July 2021.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge